IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

EMILY BARTELL,                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )        1:21CV953
                                  )
GRIFOLS SHARED SERVICES NA,       )
INC., INTERSTATE BLOOD BANK       )
INC., and BIOMAT, USA, INC.,      )
                                  )
          Defendants.             )

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Before this court is a Motion for Preliminary Injunction,
(Doc. 5), filed by Plaintiff Emily Bartell. For the reasons set
forth herein, this court will grant in part Plaintiff's motion.

**I.    PROCEDURAL HISTORY**

Plaintiff filed a Motion for Preliminary Injunction,
(Doc. 5), seeking an interim remedy for alleged violations of
the Americans with Disabilities Act ("ADA") and Section 504 of
the Rehabilitation Act. Plaintiff filed a brief in support of
her motion. (Mem. of Law in Supp. of Mot. for Prelim. Inj.
("Pl.'s Br.") (Doc. 6).) Attached to Plaintiff's motion is a
Declaration of Emily Bartell (Decl. of Emily Bartell ("Bartell
Decl.") (Doc. 5-1)), a Declaration of Darrel Butch Holloway

("Holloway Decl.") (Doc. 5-2)), and a Declaration of David H. Johnson ("Johnson Decl.") (Doc. 5-3)). Defendants Grifols Shared Services NA, Inc. ("Grifols"), Interstate Blood Bank Inc. ("IBBI"), and Biomat, USA, Inc. ("Biomat") (together, "Defendants") filed a brief in opposition to Plaintiff's motion, (Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Prelim. Inj. ("Defs.' Resp.") (Doc. 22)), and attached a Declaration of Mark Becker, MD ("Becker Decl.") (Doc. 22-1)). Plaintiff replied, (Reply to Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. ("Pl.'s Reply") (Doc. 27)), and attached a supplemental Declaration of Emily Bartell, (Decl. of Emily Bartell ("Bartell Suppl. Decl.") (Doc. 27-1)), a Declaration of Pamela Douglas, MSN, RN, CIC® (Decl. of Pamela Douglas, MSN, RN, CIC® ("Douglas Decl.") (Doc. 27-2)), and a supplemental Declaration of David H. Johnson (Decl. of David. H Johnson ("Johnson Suppl. Decl.") (Doc. 27-3)). Having reviewed the motion, the supporting documents, all matters of record, and the briefing, this court's findings of fact and conclusions of law are contained herein. Infra Parts II-III. These findings and conclusions are only made for the purpose of issuing a preliminary injunction and are therefore not final.

## II. **FINDINGS OF FACT**

1. Biomat is the parent company of IBBI. (Becker Decl. (Doc. 22-1) ¶ 7.)[1]

2. IBBI operates plasmapheresis donation centers ("PDC") throughout the United States, including one in Asheville, North Carolina. (Id. ¶ 5.)

3. Plaintiff is blind and relies on a service animal to navigate her surroundings. (Bartell Decl. (Doc. 5-1) ¶¶ 3-4.)

4. Plaintiff's service animal is an eight-year-old golden retriever that was trained by the Seeing Eye Inc., an organization that trains service dogs for people who experience blindness. (Id. ¶ 6; Johnson Decl. (Doc. 5-3) ¶¶ 1-2.)

5. Plaintiff has had her service animal since 2015. (Bartell Decl. (Doc. 5-1) ¶ 7.)

6. Plaintiff's service animal "is well-groomed, in good health, and up-to-date on all required vaccinations." (Bartell Suppl. Decl. (Doc. 27-1) ¶ 4.) Plaintiff's service animal regularly sees a veterinarian, is groomed daily, and has never given Plaintiff an infection. (Id. ¶¶ 5-7.)

7. Prior to getting a service animal, Plaintiff used a white cane for navigation, which caused bruising and discomfort,

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

-3-

and, unlike her service animal, could not detect overhead objects. (Bartell Decl. (Doc. 5-1) ¶ 11.)

8. Plaintiff has regularly donated plasma at a PDC in Asheville, North Carolina since August 2019. (Id. ¶ 12.)

**Plasma Donation Process**

9. There are four phases for new donors in the plasma donation process. (Becker Decl. (Doc. 22-1) ¶ 12.) "First, prior to each donation, all donors must complete a health history questionnaire. . . . In the Asheville PDC, this is typically done with a self-serve kiosk in the lobby." (Id. ¶ 13; see also Bartell Decl. (Doc. 5-1) ¶¶ 19–20.)

10. The second step of the plasma donation process requires donors to "complete a screening process where the donor's weight, blood pressure, pulse and temperature are measured, and a blood sample is collected to test for total protein and hematocrit." (Becker Decl. (Doc. 22-1) ¶ 14; see also Bartell Decl. (Doc. 5-1) ¶ 21.) Because a staff member is required to complete the screening process, "sometimes donors must wait in a designated area until a staff member is available." (Becker Decl. (Doc. 22-1) ¶ 14.)

11. Only new patients complete the third step, where they have "an in-depth health history interview with a member of the

-4-

medical staff, an informed consent process for the plasmapheresis process, and a physical examination." (Id. ¶ 15.)

12. The fourth step is the plasma donation. (Id. ¶ 16.) A donor is led to the donor floor, where he lays in a bed while the plasma donation process occurs. (Id.; see also Bartell Decl. (Doc. 5-1) ¶ 22.)

**Plaintiff's Plasma Donation**

13. Plaintiff has been "a routine plasma donor" at a PDC in Asheville North Carolina "since August 2019." (Bartell Decl. (Doc. 5-1) ¶ 12.)

14. The kiosks that donors use to complete phase one of the plasma donation process are inaccessible to Plaintiff. (Id. ¶ 33.)

15. Instead of completing the health history questionnaire on the kiosks, Plaintiff "must wait for a staff member to become available to complete the check in process." (Id. ¶ 34.)

16. Plaintiff's "check-in process is far more time consuming than it is for [her] sighted companion. He is typically finished with the check in process in minutes whereas it takes [her] 20-30 minutes or longer to check in." (Id.)

17. Plaintiff completes the health history questionnaire in the same area where she completes phase two, the health screening. (Id. ¶ 35.)

18. Plaintiff describes the area as "small," "semi-private," (id.), and "open air," (Bartell Suppl. Decl. (Doc. 27-1) ¶ 18). Defendants describe the area as a "private room." (Becker Decl. (Doc. 22-1) ¶ 26.)

19. Plaintiff "can often hear conversations between donation center staff and other donors in neighboring cubicles." (Bartell Suppl. Decl. (Doc. 27-1) ¶ 19.)

20. "The staff member goes through the pre-donation questionnaire verbally with [Plaintiff] and [Plaintiff] verbally respond[s]." (Bartell Decl. (Doc. 5-1) ¶ 35.)

21. Plaintiff has asked on multiple occasions for an alternative format of the health history questionnaire because she is "very uncomfortable having to provide [her] health and other confidential information out loud and potentially within earshot of others." (Id. ¶¶ 35-36.)

22. Plaintiff's service animal accompanied Plaintiff to donate plasma. (Bartell Suppl. Decl. (Doc. 27-1) ¶ 8.) Her service animal would lay "on the opposite side of [her] donor chair from the plasma machine" and "was on leash and under [her] verbal command throughout the plasma donation process." (Id. ¶¶ 9-10.) Plaintiff's "service animal never interfered with the plasma donation process," and "[t]he donation center staff

-6-

frequently told [Plaintiff] that [her] service animal is one of the best service animals they encountered." (Id. ¶¶ 11, 13.)

**Denial of Plaintiff's Service Animal**

23. In December 2020, "Grifols wholly acquired IBBI[,] and IBBI began implementing Grifols' health and safety standards." (Becker Decl. (Doc. 22-1) ¶ 6.)

24. Defendants "implement rigorous health and safety policies." (Id. ¶ 21.) These policies allow "[a]nyone from the public, including service animals, . . . in all public areas of the PDC. However, the donor floor, where the actual donation takes place, is not open to the public." (Id. ¶ 22.) Defendants prohibit service animals from entering the donor floor. (Id. ¶ 23.)

25. The purpose of Defendants' policy is "to both protect the collection materials and collected plasma from microbial and other contamination and the safety of staff and donors, whether that be through risk of infection or posing tripping hazards." (Id. ¶ 24.)

26. Dogs can transmit organisms to humans and vice versa, but "[n]ot all organisms are transmissible between species." (Douglas Decl. (Doc. 27-2) ¶ 12.)

-7-

27. The main way a human can become infected "from a dog is via ingestion of urine, feces, or saliva from an infected dog." (Id. ¶ 13.)

28. Because "[p]lasma donation utilizes a 'closed system,' . . . [t]o contaminate the plasma, an infected dog . . . would have to perform a behavior such as licking the needle being used." (Id. ¶ 15.)

29. Keeping a dog laying on the ground or seated should eliminate the risk of contaminating the plasma. (Id.)

30. On December 24, 2020, staff at the PDC told Plaintiff her service animal could no longer accompany her on the donor floor. (Bartell Decl. (Doc. 5-1) ¶ 23.)

31. On January 5, 2021, Plaintiff brought her service animal to the PDC and was again told her service animal could not accompany her on the donor floor because Defendants had a "no animal" policy. (Id. ¶¶ 25–26.)

32. Plaintiff continues to donate plasma, but she uses her cane to navigate instead of her service animal. (Id. ¶¶ 30–31.) Her cane "is not as effective at alerting [her] to obstacles as [her] service dog," and it causes her to bruise. (Id. ¶ 30.)

Additional facts will be addressed hereafter as necessary.

## III. **CONCLUSIONS OF LAW**

"A plaintiff seeking a preliminary injunction must establish" four prongs: "that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "Courts considering whether to impose preliminary injunctions must separately consider each Winter factor." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017). Such an "injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." Id. The moving party bears the burden of "clearly establish[ing] entitlement to the relief sought." Id.

Here, Plaintiff has established all four prongs as related to her claim that Defendants violated the ADA and Rehabilitation Act by denying her access to her service animal on the plasma donor floor, and therefore this court will issue a preliminary injunction in her favor. This preliminary injunction will preserve the status quo until this case is adjudicated on a more fulsome and developed record. Each prong is addressed in turn.

-9-

**A.    Likelihood of Success of the Merits**

"A plaintiff need not establish a 'certainty of success,' but must make a clear showing that he is likely to succeed." Id. (quoting Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013)). "[T]he burden placed upon Plaintiff[] to show that each requirement of a preliminary injunction is met is high. Consequently, merely 'providing sufficient factual allegations to meet the [Fed. R. Civ. P.] 12(b)(6) standard of Twombly and Iqbal' does not show a likelihood of success on the merits." J.O.P. v. U.S. Dep't of Homeland Sec., 338 F.R.D. 33, 60 (D. Md. 2020) (alterations in original) (quoting Allstate Ins. Co. v. Warns, Civil No. CCB-11-1846, 2012 WL 681792, at *14 (D. Md. Feb. 29, 2012)). "Courts have declined to issue a preliminary injunction when there are significant factual disputes." Chattery Int'l, Inc. v. JoLida, Inc., Civil No. WDQ-10-2236, 2011 WL 1230822, at *9 (D. Md. Mar. 28, 2011).

Plaintiff alleges Defendants violated Title III of the ADA, 42 U.S.C. § 12181, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. (Compl. (Doc. 1) ¶¶ 53–93.) Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C.

§ 12182(a). Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).[2]

"To the extent possible, [courts] construe the ADA and Rehabilitation Act to impose similar requirements. Thus, despite the different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability." Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 461 (4th Cir. 2012) (internal citations omitted). The parties have focused on the ADA anti-discrimination requirements, (see Pl.'s Reply (Doc. 27) at 3 n.1; Defs.' Resp. (Doc. 22) at 8–19), and this court will do the same.

Both the ADA and the Rehabilitation act require that reasonable modifications be made by covered actors for individuals with disabilities. See Halpern, 669 F.3d at 461. Plaintiff contends Defendants violated this requirement by (1) excluding her service animal from the donor floor; and

---

[2] Defendants do not dispute that they are covered entities under Title III of the ADA and Section 504 of the Rehabilitation Act. (See Defs.' Resp. (Doc. 22).)

(2) failing to provide effective communication during the plasma donation check-in process. (Compl. (Doc. 2) ¶¶ 57–77.)

### 1. <u>Excluding Service Animal from the Donor Floor</u>

Under the ADA as well as the Rehabilitation Act, "it constitutes discrimination . . . to refuse to permit disabled individuals to be accompanied by service animals." <u>Berardelli v. Allied Servs. Inst. of Rehab. Med.</u>, 900 F.3d 104, 114 (3d Cir. 2018); <u>see also</u> 28 C.F.R. § 36.302(c)(1) ("Generally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability."). "A covered actor therefore violates both statutes per se if it denies a disabled person's request to be accompanied by his or her service animal unless" an exception applies. <u>C.G. by & through P.G. v. Saucon Valley Sch. Dist.</u>, 571 F. Supp. 3d 430, 440 (E.D. Pa. 2021). Title III of the ADA's general prohibition of discrimination by public accommodations does not require a covered actor to allow a service animal if (1) the service animal "poses a direct threat to the health or safety of others"; (2) the service animal "would fundamentally alter the nature of the service"; (3) "[t]he animal is out of control and the animal's handler does not take effective action to control it"; or (4) "[t]he animal is not housebroken." 28

-12-

C.F.R. §§ 35.130(b)(7)(i), 35.136(b)(1)-(2), 35.139(a), 36.302(c)(2).

### a. <u>Direct Threat to Health of Safety</u>

Defendants argue that "[s]ervice animals pose a direct threat to the health or safety of others in the unique setting of a PDC." (Defs.' Resp. (Doc. 22) at 13 (citing 42 U.S.C. § 12182(3)).) Defendants contend their policy of excluding service animals from the donor floor accords with the Department of Justice's ("DOJ") guidance on Title III of the ADA. (<u>Id.</u> at 10-12.) DOJ advises that

> [a] service animal may accompany its handler to such areas as admissions and discharge offices, the emergency room, inpatient and outpatient rooms, examining and diagnostic rooms, clinics, rehabilitation therapy areas . . . and all other areas of the facility where healthcare personnel, patients, and visitors are permitted without taking added precautions.

28 C.F.R. pt. 36, app. A. But "[c]onsistent with [Centers for Disease Control] guidance, it is generally appropriate to exclude a service animal from limited-access areas that employ general infection-control measures, such as operating rooms and burn units." <u>Id.</u>

Defendants equate their donor floor to a burn unit or operating room. (<u>See</u> Defs.' Resp. (Doc. 22) at 10-11.) On the donor floor, the donor "remain[s] on the donor bed and avoid[s] movement of the arm" while "a sterile needle is placed into the

-13-

donor's vein, which is connected with single use sterile tubing to an automated plasmapheresis machine." (Becker Decl. (Doc. 22-1) ¶ 16.) The plasma donation process takes about forty-five minutes. (Id.) Pamela Douglas, "an infection control professional with experience working in human healthcare and veterinary settings," described in her affidavit the difficulty of contaminating plasma because "[p]lasma donation utilizes a 'closed system.'" (Douglas Decl. (Doc. 27-2) ¶¶ 1, 15.) She also noted that the plasma donation process does not take place in a sterile environment. (Id. ¶ 17.) Potential donors complete a health history questionnaire, a screening process, and, for new donors, an in-depth history interview, but these procedures, according to Dr. Becker, are for the purpose of determining a donor's eligibility; infection control is not mentioned. (See Becker Decl. (Doc. 22-1) ¶¶ 12-15.)

While implicitly these preliminary phases of the plasma donation process may be in part to mitigate infection, that inference is belied by the fact Plaintiff had donated dozens of times with her service animal present prior to December 2020. (See Bartell Decl. (Doc. 5-1) ¶¶ 12, 23-24; Becker Decl. (Doc. 22-1) ¶ 31.) It does not appear Plaintiff and her service animal increased the risk of infection in the past, and if the purpose of the preliminary phases was to mitigate infection,

-14-

Defendants offer no evidence as to why Plaintiff was not barred from donating with her service animal in the past. At this stage of the litigation, Defendants offer no evidence to support a finding that new evidence suggests Plaintiff's service animal is now a recognized risk of infection. This court is unpersuaded Defendants have taken similar infection-prevention measures contemplated by burn units and operating rooms to make Plaintiff's service animal a direct threat while on the donor floor.

Moreover, Defendants have failed to offer any evidence that they have "ma[d]e an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain," the risk and likelihood of injury Plaintiff's service animal poses to the plasma donation process. 28 C.F.R. § 36.208(b). The regulations require such individualized assessment before refusing to permit an individual to participate in services. Id. Defendants suggest such individualized assessment "is inapplicable to service animals and only applies to persons." (Defs.' Resp. (Doc. 22) at 13 n.2.) This court disagrees. The DOJ guidance explains that DOJ decided against "includ[ing] regulatory language specifically stating that a service animal can be excluded if it poses a direct threat" because DOJ

"believes that the direct threat provision in § 36.208 already provides [an] exception to public accommodations" for when a service animal can be excluded. 28 C.F.R. pt. 36, app. A. Thus, Section 36.208 applies to services animals, and nothing in the regulation's language or the DOJ guidance provides that a public accommodation is exempt from conducting an individualized assessment of the risk posed by a service animal. Absent an individualized assessment, Defendants have not shown Plaintiff's service animal poses a direct threat to the health and safety of others at the PDC.[3]

Defendants further argue that "service animals can behave unpredictably," so their policy is necessary to protect the health and safety of donors and employees. (Defs.' Resp. (Doc. 22) at 13-14.) Although "[a] public accommodation may impose legitimate safety requirements that are necessary for safe operation," those "requirements must be based on actual risks and not on mere speculation, stereotypes, or

---

[3] Defendants cite Pool v. Riverside Health Services, Inc., No. 94-1430-PFK, 1995 WL 519129 (D. Kan. Aug. 25, 1995), as support for their position that they are not required to conduct an individualized assessment of Plaintiff's service animal. (See Defs.' Resp. (Doc. 22) at 13 n.2.) Pool dealt with a patient's family member's request to bring her service animal into the emergency room treatment area, see 1995 WL 519129, at *1, an area the DOJ guidance contemplates as an area where a service animal may accompany its handler, 28 C.F.R. pt. 36, app. A. To the extent Pool and the DOJ guidance conflict, this court finds the DOJ guidance more persuasive, especially considering Pool was decided over ten years before the DOJ issued its guidance.

-16-

generalization about individuals with disabilities." 28 C.F.R.
§ 36.301(b). Defendants' exclusion of Plaintiff's service animal
is based only on speculation. Defendants describe a hypothetical
scenario where "a service animal loses control on the donor
floor, with an immobilized handler and immobilized victims."
(Defs.' Resp. (Doc. 22) at 14.) This scenario in not based on
actual risks; Plaintiff's service animal never caused issues on
the donor floor in the past. (Bartell Decl. (Doc. 5-1) ¶ 26;
Bartell Suppl. Decl. (Doc. 27-1) ¶¶ 11, 13.) Defendants point to
Plaintiff's service animal's past behavior in "unanticipated
situations" as evidence of a direct threat to safety. (Defs.'
Resp. (Doc. 22) at 13-14 (emphasis omitted).) But that
unanticipated situation was created by Defendants when they
separated Plaintiff and her service animal and put the service
animal in a separate room from Plaintiff. (See Compl. (Doc. 2)
¶¶ 28-33.) Such a situation cannot reasonably be anticipated to
occur if Plaintiff and her service animal are together on the
donor floor because the only time Plaintiff's service animal
exhibited concerning behavior was when Defendants separated the
service animal from Plaintiff. This court concludes Defendants
have failed to show Plaintiff's service animal is a direct
threat to the health and safety of donors and PDC employees.

-17-

### b. **Fundamentally Alter**

In addition to arguing Plaintiff's service animal is a
direct threat to safety, Defendants argue allowing Plaintiff's
service animal on the donor floor would fundamentally alter
their service. (Defs.' Resp. (Doc. 22) at 15.) Defendants
contend that "permitting service animals would fundamentally
alter the nature of Defendants' accommodation—the safe and
sanitary collection of plasma." (Id.)

This court finds permitting Plaintiff's service animal
would not fundamentally alter Defendants' plasma donation
service. Douglas opined "that vaccinated, healthy, well-trained
service animals pose no greater risk of infection transmission
than is created by other people, including both donors and
staff, being present on the plasma donation floor." (Douglas
Decl. (Doc. 27-2) ¶ 20.) Plaintiff's service animal is
vaccinated, healthy, and well-trained. (Bartell Suppl. Decl.
(Doc. 27-1) ¶¶ 4-5; Bartell Decl. (Doc. 5-1) ¶¶ 6-8.) Defendants
offer no evidence to the contrary besides their unsupported
opinion that allowing Plaintiff's service animal would
fundamentally alter the plasma donation process. It is unclear
to this court how allowing Plaintiff's service animal would
fundamentally alter Defendants' service when there is no
evidence the plasma donation process changed after IBBI was

-18-

acquired by Grifols, and prior to that acquisition the presence of Plaintiff's service animal apparently did not fundamentally alter the provision of plasma donation services.

Defendants further argue that permitting Plaintiff's service animal would cause Defendants to be in non-compliance with the Food and Drug Administration ("FDA") regulations governing PDCs. (Defs.' Resp. (Doc. 22) at 8–10.) Under 21 C.F.R. § 606.40, Defendants are required to maintain their PDCs "in a clean and orderly manner," to "[p]rovide adequate space for . . . [t]he orderly collection, processing, compatibility testing, storage and distribution of blood and blood components to prevent contamination."

Defendants argue "[a]nimals on the donor floor present an increased risk of contamination of the plasma because they are more likely than humans to carry fleas, ticks, rabies, or other microbial; to release dust, fur, dander, or other allergens into the air; or to unexpectedly and uncontrollably release bodily fluids." (Defs.' Resp. (Doc. 22) at 9.) Defendants offer no evidence in support of this opinion.[4] This unsupported assertion

─────────────

[4] To the extent Defendants rely on Plaintiff's service animal's reaction to being separated from Plaintiff as evidence of increased risk of contamination, for the reasons explained supra Section III.A.1, the service animal's response to being separated from Plaintiff is not indicative of how the animal would act in Plaintiff's presence.

-19-

is diminished by an infection control professional's description of plasma donation. Douglas explains that

> [p]lasma donation utilizes a 'closed system,' meaning that blood is withdrawn from the donor via a sterile needle and a single use tubing. . . . To contaminate the plasma, an infected dog with a zoonotic illness transmissible through saliva would have to perform a behavior such as licking the needle being used or the site of the needle insertion in the arm of the plasma donor, or the plasma donation center staff would have to pet the infected dog, transmissible pathogens would have to be present, and staff would then have to fail to wash their hands or wear gloves while inserting the needle into the donor's arm.

(Douglas Decl. (Doc. 27-2) ¶ 15.) This court finds Defendants have failed to show Plaintiff's service animal's presence would increase the risk of infection or contamination.

The FDA regulations also require "adequate space" for the plasma donation process. (See Defs.' Resp. (Doc. 22) at 10 (internal quotation marks omitted) (quoting 21 C.F.R. § 606.40).) Defendants contend they will be in violation of this regulation if they are required to allow service animals onto the donor floor. (Id.) This court disagrees. First, Plaintiff is seeking an injunction only as to herself and her service animal, (Pl.'s Reply (Doc. 27) at 4 ("Ms. Bartell seeks an individual injunction[.]")), not an injunction as to "any and all service animals" as argued by Defendants, (Defs.' Resp. (Doc. 22) at 10). Second, Defendants offer no evidence that they will be in non-compliance with the FDA regulation's requirement of adequate

-20-

space if they allow Plaintiff's service animal to accompany her
to the donor floor, nor do they acknowledge that it is their
burden under the regulation to provide adequate space.
Accordingly, this court finds Defendants have failed to show
that allowing Plaintiff's service animal on the donor floor
would fundamentally alter their plasma donation process.

### c.  **Under Control**

Finally, Defendants argue that their policy excluding
service animals from the donor floor is justified by Title III's
regulation requiring service animals to be under control.
(Defs.' Resp. (Doc. 22) at 15–16.) 28 C.F.R. § 36.302(c)(4)
requires that

> [a] service animal shall be under the control of its
> handler. A service animal shall have a harness, leash,
> or other tether, unless either the handler is unable
> because of a disability to use a harness, leash, or
> other tether, or the use of a harness, leash, or other
> tether would interfere with the service animal's safe,
> effective performance of work or tasks, in which case
> the service animal must be otherwise under the
> handler's control (e.g., voice control, signals, or
> other effective means).

Again, Defendants contemplate a hypothetical scenario where
"a service animal becomes startled" and there is "no one who can
gain control" because "a donor is limited to a single bed, with
a needle arresting mobility." (Defs.' Resp. (Doc. 22) at 16.)
Defendants do not contend that Plaintiff's service animal has
ever been out of control. To the contrary, Plaintiff's "service

-21-

dog was on leash and under [her] verbal command throughout the plasma donation process" and has "never interfered with the plasma donation process." (Bartell Suppl. Decl. (Doc. 27-1) ¶¶ 10-11.) Plaintiff's service animal has never "misbehaved or been disruptive or aggressive" "in new and sometimes unpredictable situations." (Bartell Decl. (Doc. 5-1) ¶ 9.) At Plaintiff's other medical appointments, including blood draws, Plaintiff's service animal "lay[s] at [her] feet as commanded and [does] not interact with the medical provider or attempt to interfere in their treatment." (Id. ¶ 10.)

This court finds that while the ADA's regulations require service animals to be under the control of their handler, Defendants offer no evidence to dispute Plaintiff's evidence that her service animal is under her control. Thus, this court finds Defendants have failed to demonstrate how Title III of the ADA's regulation concerning control of service animals warrants excluding Plaintiff's service animal.

In conclusion, Defendants have failed to show that Plaintiff's service animal is a direct threat to safety, would fundamentally alter the nature of their service, and is not under control. On the other hand, Plaintiff has demonstrated a likelihood of success on the merits of her claim that Defendants violated Title III of the ADA and Section 504 of the

Rehabilitation Act by excluding her service animal from the donor floor.

### 2. <u>Failure to Provide Effective Communication</u>

Plaintiff alleges Defendants also violated the ADA and Rehabilitation Act by failing to provide effective communication to Plaintiff during the plasma donation process. (Compl. (Doc. 2) ¶¶ 67-77.) A public accommodation discriminates against an individual with a disability when it

> fail[s] to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. § 12182(b)(2)(A)(iii); <u>see also</u> 28 C.F.R. § 36.303(a) ("A public accommodation shall take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the public accommodation can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden, i.e., significant difficulty or expense.").

-23-

Examples of appropriate aids for the visually impaired include "[q]ualified readers," "accessible electronic and information technology," "audio recordings," "screen reader software," and the "[a]cquisition or modification of equipment or devices." 28 C.F.R. § 36.303(b)(2), (3).

"Title III and its implementing regulations require public accommodations to furnish 'appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities.'" Nat'l Fed. of the Blind, Inc. v. Wal-Mart Assocs., Inc., 566 F. Supp. 3d 383, 399 (D. Md. 2021) (quoting 28 C.F.R. § 36.303(c)(1)). "[T]he type of auxiliary aid that ensures 'effective communication' varies by context." Feldman v. Pro. Football, Inc., 419 F. App'x 381, 391 (4th Cir. 2011). "[T]he ultimate decision as to what measures to take rests with the public accommodation," but the "auxiliary aids and services must be provided [1] in accessible formats, [2] in a timely manner, and [3] in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 36.303(c)(1)(ii).

Defendants argue they have provided a suitable auxiliary aid and service to Plaintiff because they have provided her "with a qualified reader to accurately and efficiently convey the information and questions otherwise available on the self-

-24-

serve kiosk." (Defs.' Resp. (Doc. 22) at 16.) Defendants contend any time delay from using a qualified reader instead of the kiosks "is negligible," and the qualified reader provides Plaintiff with greater privacy than sighted individuals have in completing the questionnaire. (Id. at 17–18.)

### a. Timely Manner

Plaintiff contends the auxiliary aid as an alternative to the self-serve kiosks is not provided in a timely manner. (See Compl. (Doc. 2) ¶ 52.) The health history questionnaire is the first phase of the plasma donation process. (Becker Decl. (Doc. 22-1) ¶ 13.) Whereas sighted individuals complete the health history questionnaire on electronic kiosks, Plaintiff completes the questionnaire during phase two, when she also completes the health screening. (Id. ¶ 26; Bartell Decl. (Doc. 5-1) ¶¶ 34–35.) Plaintiff contends that it takes her twenty to thirty minutes to complete phase one, whereas it takes her sighted partner three to five minutes. (Bartell Decl. (Doc. 5-1) ¶ 34; Bartell Suppl. Decl. (Doc. 27-1) ¶¶ 17, 20; Holloway Decl. (Doc. 5-2) ¶ 11.) Defendants do not dispute that it may take Plaintiff longer to complete phase one than it takes sighted individuals; rather, they contend the total time of the donation process is the same for Plaintiff and sighted individuals. (Defs.' Resp. (Doc. 22) at 17.)

-25-

Defendants' argument has merit. Plaintiff cannot use the kiosks for phase one of the plasma donation process, so she must wait for a staff member to become available before she can complete the questionnaire with a staff member. (Bartell Decl. (Doc. 5-1) ¶¶ 33–35.) Phase one of the plasma donation process takes her twenty to thirty minutes, in part because she has to wait for a staff member to become available, (id. ¶ 34), whereas it takes her sighted partner three to five minutes to complete phase one, (Holloway Decl. (Doc. 5-2) ¶ 11). However, once Plaintiff has completed the questionnaire, she does not have to wait again for a staff member to become available; instead, she begins phase two with the staff member who just completed the questionnaire with her. (See Bartell Decl. (Doc. 5-1) ¶ 35; Becker Decl. (Doc. 22-1) ¶¶ 26–27 ("Since Ms. Bartell cannot use the self-serve kiosk, she completes the first phase when she completes the second, with a member of the donor staff in a private room. . . . This is done at the same time that all donors complete the second phase.").) On the other hand, once sighted individuals complete phase one at the kiosks, they must wait for a staff member to become available to complete phase two. (Becker Decl. (Doc. 22-1) ¶ 14 ("Depending on the time of day, staff availability, and the volume of donors, sometimes donors must wait in a designated area until a staff member is

-26-

available").) Thus, while Plaintiff must wait for a staff member to become available before completing phase one, but not phase two, sighted individuals must wait for a staff member before completing phase two. (Id. ¶¶ 14, 26-27.) As a result, this court finds the time it takes Plaintiff to complete the plasma donation process compared to sighted individuals is comparable, and to the extent it takes Plaintiff longer to verbally complete the health history questionnaire with a qualified reader as compared to the self-serve kiosks, Plaintiff has not "clearly establishe[d]" that, Di Biase, 872 F.3d at 230, such that this court could find Plaintiff has demonstrated a likelihood of success on the merits.

b. **Protection of Plaintiff's Privacy**

In addition to alleging the auxiliary aid was not provided in a timely manner, Plaintiff alleges the auxiliary aid does not protect her privacy. (Compl. (Doc. 2) ¶ 52.) Instead of using the kiosks to complete a health history questionnaire, Plaintiff completes the questionnaire with a staff member "in [a] small, semi-private area." (Bartell Decl. (Doc. 5-1) ¶¶ 34-35.) The staff member verbally asks Plaintiff the questions on the health history questionnaire, and Plaintiff answers them verbally. (Id. ¶ 35.) "The cubicles where [she] provides [her] answers to the check in questionnaire are 'open air'—the cubicle walls do not

-27-

reach the ceiling." (Bartell Suppl. Decl. (Doc. 27-1) ¶ 18.) Plaintiff is "unclear as to how sound-proof and private this area actually is," (Bartell Decl. (Doc. 5-1) ¶ 35), but she "can often hear conversations between donation center staff and other donors in neighboring cubicles," (Bartell Suppl. Decl. (Doc. 27-1) ¶ 19). Plaintiff is "uncomfortable having to provide [her] health and other confidential information out loud and potentially within earshot of others." (Bartell Decl. (Doc. 5-1) ¶ 35.) In contrast to Plaintiff's description, Dr. Becker describes the cubicles where Plaintiff completes the first and second phases of the plasma donation process as "private." (Becker Decl. (Doc. 22-1) ¶ 26.)

Thus, it appears there is a "significant factual dispute[]," Allegra Network LLC v. Reeder, Civil Action No. 1:09-cv-912, 2009 WL 3734288, at *3 (E.D. Va. Nov. 4, 2009), about whether Plaintiff completes the health history questionnaire in private or in an area where other donors and visitors to the PDC can hear as a result of conflicting affidavits from the parties, (compare Bartell Suppl. Decl. (Doc. 27-1) ¶ 18, with Becker Decl. (Doc. 22-1) ¶ 26). This court could rule that "[b]ecause the [c]ourt cannot resolve these factual inconsistencies, the [c]ourt finds that Plaintiff has been unable to establish that Defendant[s] did in fact"

violate the ADA and Rehabilitation Act by failing to provide auxiliary aids that were effective communication. See Allegra Network, 2009 WL 3734288, at *3. This court could also rule that an evidentiary hearing is required to resolve this factual discrepancy. See Cobell v. Norton, 391 F.3d 251, 261 (D.C. Cir. 2004) ("[I]f there are genuine issues of material fact raised in opposition to a motion for a preliminary injunction, an evidentiary hearing is required[.]"). This court therefore instructs the parties to file a response within ten days of this Memorandum Opinion and Order outlining how they wish to proceed. Because this court is not ruling at present on the second prong of requested relief related to whether Defendants have provided effective communication to Plaintiff, this court will not address the other Winter factors as to that prong.

### B. **Likelihood of Irreparable Harm**

In addition to a likelihood of success on the merits, a plaintiff seeking a preliminary injunction must also "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 347 (4th Cir. 2009), vacated on other grounds 559 U.S. 1089. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or

other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." Sampson v. Murray, 415 U.S. 61, 90 (1974) (internal quotation marks omitted) (quoting Va. Petrol. Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958)).

Plaintiff argues that "Defendant's failure to permit Ms. Bartell to be assisted by her service animal throughout the plasma donation process and failure to communicate as effectively with Ms. Bartell as it does with sighted donors causes her irreparable harm." (Pl.'s Br. (Doc. 6) at 16.) Specifically, Plaintiff maintains that discriminatory deprivation of a service animal and denial of effective communication are both irreparable harms. (Id. at 17.)

Defendants argue that violations of Title III of the ADA are not per se irreparable harm, and that "Plaintiff's actual harm, to the extent any is alleged, is insufficient to find an irreparable injury" because she "continues to donate with similar frequency," so the harm cannot be considered irreparable. (Defs.' Resp. (Doc. 22) at 20-21.)

Courts have held that that when a defendant violates a civil rights statute, such as the ADA, irreparable injury is presumed. See Pathways Psychosocial v. Town of Leonardtown, 223 F. Supp. 2d 699, 717 (D. Md. 2002) (recognizing violation of

-30-

Title II of the ADA and Section 504 of the Rehabilitation Act
created a presumption of irreparable injury); see also Silver
Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814,
827 (9th Cir. 2001) ("We have held that where a defendant has
violated a civil rights statute, we will presume that the
plaintiff has suffered irreparable injury from the fact of the
defendant's violation."); Burlington N.R.R. Co. v. Dep't of
Revenue of State of Wash., 934 F.2d 1064, 1074 (9th Cir. 1991)
("The standard requirements for equitable relief need not be
satisfied when an injunction is sought to prevent the violation
of a federal statute which specifically provides for injunctive
relief.") (quoting Trailer Train Co. v. State Bd. of
Equalization, 697 F.2d 860, 869 (9th Cir. 1983)); Gresham v.
Windrush Partners, Ltd., 730 F.2d 1417, 1423 (11th Cir. 1984)
(holding "irreparable injury may be presumed from the fact of
discrimination and violation of fair housing statutes").

    This court finds Plaintiff has established a likelihood of
irreparable harm absent injunctive relief. This is not a case
where the plaintiff has "fail[ed] to show any real or immediate
threat that she will be wronged again." See Thomas v. Salvation
Army S. Territory, 841 F.3d 632, 638 (4th Cir. 2016) (affirming
district court's finding of no irreparable harm where the
plaintiff did "not allege that she is still homeless or that the

defendants would still deny her access to the shelters because of her disability" in bringing a claim under Title III of the ADA). Instead, Plaintiff has demonstrated she "will be wronged again," City of L.A. v. Lyons, 461 U.S. 95, 111 (1983), absent injunctive relief because Defendants continue to deny Plaintiff access to her service animal on the donor floor, (Bartell Decl. (Doc. 5-1) ¶ 27). This is not a "blanket injunction" that makes Defendants "powerless to . . . make [Plaintiff] comply with a variety of generally applicable restrictions that are in the public interest." Pathways Psychosocial, 223 F. Supp. 2d at 717–18. Plaintiff's requested relief seeks to preliminarily enjoin Defendants from further violation of the ADA and Rehabilitation Act until this case is decided on the merits. Accordingly, this court finds Plaintiff has established a likelihood of irreparable harm absent injunctive relief.

C.  **Balance of Equities**

The third preliminary injunction prong requires that this court determine whether "the balance of equities tips in [Plaintiff's] favor." Winter, 555 U.S. at 20. This requires assessment of "the harm Defendants will suffer if Plaintiff's motion is granted." Int'l Lab. Mgmt. Corp. v. Perez, No. 1:14CV231, 2014 WL 1668131, at *14 (M.D.N.C. Apr. 25, 2014).

Plaintiff argues "[t]he balance of hardships tips in [her] favor" because she is forced to use her cane instead of her service animal, "which causes bruising," endures "a significantly longer donation process[,] and lack of privacy and independence in communicating health information." (Pl.'s Br. (Doc. 6) at 19.) Additionally, Plaintiff argues Defendants would not incur substantial costs in allowing her service animal on the donor floor. (Id.)

Defendants contend the balance of equities tips in their favor because "[t]he requested injunction would require Defendants to choose between risking their licenses by violating FDA regulations, and shutting their doors," whereas the harm to Plaintiff "is using a person to guide her on the donor floor rather than a dog" and "does not impact her ability to continue donating." (Defs.' Resp. (Doc. 22) at 22–24.)

-33-

Contrary to Defendants' argument, a preliminary injunction ordering Defendants to allow Plaintiff's service animal to accompany her on the donor floor would not cause Defendants to violate the FDA regulations. As discussed already, having Plaintiff's service animal on the donor floor does not violate the FDA regulations on plasma donation. See discussion supra Section III.A.1.b. Although Plaintiff can and does continue to donate plasma with the use of her cane, using her cane causes her to bruise and is less effective at alerting Plaintiff of obstacles. (See Bartell Decl. (Doc. 5-1) ¶¶ 30-31.) Moreover, allowing Plaintiff's service animal on the donor floor cannot reasonably be said to disrupt the plasma donation process, or the sterilization or quality, because Plaintiff donated plasma regularly with her service animal prior to December 2020. (See id. ¶¶ 12, 23-24.) Because Defendants will suffer little, if any, harm, and Plaintiff has demonstrated a likelihood of irreparable harm, this court finds the balance of equities, while albeit perhaps a close call, tips in Plaintiff's favor.

D.  **Public Interest**

The final prong Plaintiff must establish is that "an injunction is in the public interest." Winter, 555 U.S. at 20. Plaintiff emphasizes that "[t]he public interest supports ending discrimination against people with disabilities," and a

-34-

preliminary injunction in this case "would . . . protect
broader, societal interests in widespread compliance with civil
rights legislation." (Pl.'s Br. (Doc. 6) at 20.) Defendants
combine their argument about the public interest with their
argument about the balance of equities. (Defs.' Resp. (Doc. 22
at 22–24.) Defendants contend "the public impact [of Defendants'
policy] is miniscule." (Id. at 23.)

　　This court finds the public interest lies with Plaintiff.
"[T]he public interest lies with upholding the law and having
the mandates of the ADA and Rehabilitation Act enforced. As
Plaintiff[] ha[s] shown a likelihood of success on the merits,
the public interest lies with preserving" Plaintiff's ability to
use her service animal "and prohibiting what appears to be a
violation of the law." Marlo M. ex rel. Parris v. Cansler, 679
F. Supp. 2d 635, 638 (E.D.N.C. 2010). A preliminary injunction
in this case would assure that Plaintiff can donate plasma
safely and without harm to herself. Defendants' assertions they
"would be presented with an impossible choice" of "hav[ing] to
consider closing operations or violating FDA standards of
cleanliness," (Defs.' Resp. (Doc. 22) at 23), are without
support as Defendants fail to show they would be in non-
compliance with the FDA regulations of plasma donations, see
supra Section III.A.1.b.

Accordingly, this court finds Plaintiff has established all four elements showing she is entitled to a preliminary injunction as to her claim under the ADA and Rehabilitation Act for denial of her service animal on the donor floor.

**E.** **Bond Requirement**

Defendants argue a bond should be required because a preliminary injunction will force Defendants "to implement a policy it believes is contrary to FDA regulations," and by the time this case is fully adjudicated, Defendants could be cited or even have their licenses revoked for non-compliance. (Defs.' Resp. (Doc. 22) at 24–25.) Plaintiff, on the other hand, contends no bond should be required based on the "speculative nature of harm to Defendants." (Pl.'s Reply (Doc. 27) at 12.) Plaintiff argues that "[i]f Defendants are notified that the presence of Ms. Bartell's service animal on the donation floor violated FDA regulations, Defendants can avoid lost revenue or harm by telling Ms. Bartell to cease bringing her service animal to the donation floor and petitioning the Court to lift the preliminary injunction." (Id.)

"Where the district court determines that the risk of harm [to the enjoined party] is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice."

-36-

<u>Hoechst Diafoil Co. v. Nan Ya Plastics Corp.</u>, 174 F.3d 411, 421
n.3 (4th Cir. 1999). The bond can be waived entirely when the
defendant would not suffer any harm from the injunction. <u>See</u>
<u>Citizens for a Responsible Curriculum v. Montgomery Cnty. Pub.</u>
<u>Schs.</u>, No. Civ.A. AW-05-1194, 2005 WL 1075634, at *12 (D. Md.
May 5, 2005).

This court finds the harm as outlined by Defendants is
speculative. Defendants do not cite any evidence of other PDCs
being forced to close their doors because they allowed service
animals on the donor floor. Plaintiff brought her service animal
regularly on the donor floor prior to December 2020 at the same
facility, yet Defendants do not suggest they were in non-
compliance with FDA regulations at that time. Nor have
Defendants provided any estimate of monetary damage they will
suffer because of a preliminary injunction. This court
recognizes that "important federal rights [are] at issue in this
case," <u>Taliaferro v. N.C. State Bd. of Elections</u>, 489 F. Supp.
3d 433, 440 (E.D.N.C. 2020), but because Defendants have
strongly opposed waiver of a bond, this court will require
Plaintiff to post a nominal bond to protect Defendants from any
administrative harm that may be incurred in allowing Plaintiff
to bring her service animal on the donor floor.

-37-

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction, (Doc. 5), is granted in part.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Preliminary Injunction, (Doc. 5), is **GRANTED** in part.

**IT IS FURTHER ORDERED** that Defendants shall make accommodations to their policies to permit Plaintiff to donate plasma while being assisted by her service animal.

**IT IS FURTHER ORDERED** that security in the amount of $500 shall serve as the bond contemplated by Federal Rule of Civil Procedure 65(c).

**IT IS FURTHER ORDERED** that Defendants **SHALL** file with this court, within three (3) days of this Memorandum Opinion and Order, a statement under oath certifying their ongoing compliance with this Order.

**IT IS FURTHER ORDERED** that Defendants have ten (10) days to respond to this court's comments regarding the issue of fact created by the parties' conflicting affidavits outlined in Section III.A.2.

This the 15th day of August, 2022.

_____
United States District Judge

-38-