IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

EMILY BARTELL,                    )
                                  )
            Plaintiff,            )
                                  )
        v.                        )        1:21-cv-953
                                  )
GRIFOLS SHARED SERVICES NA,       )
INC., INTERSTATE BLOOD BANK,      )
INC., and BIOMAT USA, INC.,       )
                                  )
            Defendants.           )


## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court are cross-motions for summary judgment.
(Docs. 52, 58.) Emily Bartell ("Plaintiff") moves for summary
judgment on her claim that Defendants violated the Americans
with Disabilities Act ("ADA") and Rehabilitation Act and seeks
declaratory and injunctive relief. (Doc. 52 at 2.) Plaintiff
also moves for summary judgment on her effective communication
claim. (Id. at 3.) Finally, Plaintiff asks this court to find
Defendants acted with deliberate indifference. (Id. at 2.)
Grifols Shared Services NA, Inc., Interstate Blood Bank, Inc.,
and Biomat USA, Inc. ("Defendants") seek summary judgment on
Plaintiff's effective communication claim and ask this court to
find as a matter of law that they did not act with deliberate

indifference. (Doc. 58.) Also before this court is Plaintiff's Motion for Leave to File a Surreply. (Doc. 66.)

This court will grant Plaintiff's Motion for Leave to File a Surreply, (Doc. 66), grant in part Plaintiff's Motion for Summary Judgment, (Doc. 52), and grant Defendants' Motion for Summary Judgment, (Doc. 58).

## I.   <u>FACTUAL BACKGROUND</u>

The majority of the facts in this case are uncontested and outlined below. Additional facts will be discussed in the analysis as necessary. To the extent there are factual disputes, they will be resolved in the light most favorable to the nonmoving party in considering each motion for summary judgment. <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003).

Plaintiff is blind and relies on a service animal to navigate her surroundings. (Bartell Decl. (Doc. 52-3) ¶¶ 3-4.)[1] Plaintiff's service animal is an eight-year-old golden retriever that was trained by the Seeing Eye Inc., an organization that trains service dogs for people who experience blindness. (<u>Id.</u> ¶ 6; Johnston Decl. (Doc. 52-4) ¶¶ 1-2.) Plaintiff's service animal "is well-groomed, in good health, and up-to-date on all

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

required vaccinations." (Decl. of Emily Bartell ("Bartell Suppl. Decl.") (Doc. 27-1) ¶ 4.) Plaintiff's service animal regularly sees a veterinarian and has never given Plaintiff an infection. (Id. ¶¶ 5-7.)

Plaintiff began donating plasma at a plasmapheresis donation center ("PDC") in Asheville, North Carolina in August 2019. (Bartell Decl. (Doc. 52-3) ¶ 12.) The PDC is operated by Interstate Blood Bank, Inc. ("IBBI"). (Becker Decl. (Doc. 52-6) ¶ 5.) In December 2020, IBBI was acquired by Grifols Shared Services NA, Inc. ("Grifols"). (Id. ¶ 6.) Biomat USA, Inc. is the parent company of IBBI and is also owned by Grifols. (Id. ¶ 7.)

### A.   **Plasma Donation Process**

There are four phases for new donors in the plasma donation process. (Becker Decl. (Doc. 52-6) ¶ 12.) "First, prior to each donation, all donors must complete a health history questionnaire . . . . In the Asheville PDC, this is typically done with a self-serve kiosk in the lobby." (Id. ¶ 13.)

The second step of the plasma donation process requires donors to "complete a screening process where the donor's weight, blood pressure, pulse and temperature are measured, and a blood sample is collected to test for total protein and hematocrit." (Id. ¶ 14.) Because a staff member is required to

- 3 -

complete the health screening, "sometimes donors must wait in a designated area until a staff member is available." (Id.)

Only new patients complete the third step, "an in-depth health history interview with a member of the medical staff, an informed consent process for the plasmapheresis process, and a physical examination." (Id. ¶ 15.)

The fourth step is the plasma donation. (Id. ¶ 16.) A donor is led to the donor floor, where he lays in a bed while the plasma donation process ("plasmapheresis") occurs. (Id.)

**B.    Plaintiff's Plasma Donation**

Plaintiff has been "a routine plasma donor" at the Asheville PDC since August 2019. (Bartell Decl. (Doc. 52-3) ¶ 12.) The kiosks that donors use to complete phase one of the plasma donation process are inaccessible to Plaintiff. (Id. ¶ 33; see also Pl.'s Expert Disclosures (Doc. 52-12) at 26.) The kiosks could be made accessible to blind users "through hardware and software changes." (Pl.'s Expert Disclosures (Doc. 52-12) at 26.)

Instead of completing the health history questionnaire on the self-serve kiosks, Plaintiff "must wait for a staff member to become available to complete the check in process." (Bartell Decl. (Doc. 52-3) ¶ 34.) Plaintiff verbally completes the health history questionnaire with a staff member in the same area where

- 4 -

all donors complete phase two, the health screening. (Id. ¶ 35.)
This area is known as a "privacy booth." (See Cunningham Decl.
(Doc. 59-3) ¶ 3.) Each "privacy booth[] . . . has three walls
that reach the ceiling. One of the walls has a door in which
potential donors enter and exit. The fourth 'wall' is a desk.
The area behind the desk opens into a staff-only administrative
area." (Id. ¶ 7.)

Donors who cannot use the kiosks, due to blindness,
illiteracy, or another reason, also complete the second step of
the plasma donation process, the health history questionnaire,
in the privacy booths. (Id. ¶¶ 4-5.) "Additionally, sighted
donors who are able to read printed material sometimes provide
medical information in the privacy booth if they have a question
about a portion of the health history questionnaire or if one of
their responses triggered necessary follow-up to determine their
eligibility." (Id. ¶ 6.)

During the second step, the health history questionnaire,
Plaintiff must verbally disclose personal information, including
her social security number, date of birth, and full name. (Pl.'s
First Dep. (Doc. 52-5) at 13.) While in the privacy booths,
Plaintiff can overhear other donors and assumes they can hear
her as well. (Pl.'s Second Dep. (Doc. 52-14) at 10.)

Plaintiff testified that it takes an average of twenty minutes to orally complete the health history questionnaire with an employee. (Pl.'s Dep. ("Defs.' Excerpts Bartell Dep.") (Doc. 59-2) at 14.) By comparison, Plaintiff's partner also donates plasma at the PDC — he uses the kiosks and the check in process usually takes him three to five minutes. (Holloway Decl. (Doc. 52-11) ¶¶ 2—3, 9, 11.)

Plaintiff stated that "in a perfect world," she would complete the health history questionnaire on an accessible kiosk where she would plug in headphones, the questionnaire would be read to her, and she would select her answers. (Defs.' Excerpts Bartell Dep. (Doc. 59-2) at 17-18.) Plaintiff stated she uses the Siri application and VoiceOver setting on her phone to have information read aloud to her and she would like to interact with the kiosk similarly. (See id. at 15-18.)

Plaintiff testified that the employees who read the health history questionnaire to her at the PDC sometimes mispronounce words and that Siri and VoiceOver also sometimes make pronunciation errors. (Id. at 12-13, 19.) However, Plaintiff "understand[s] and comprehends[s] everything" read to her during the questionnaire and understands the information being communicated to her by Siri and VoiceOver "the majority of the time." (Id. at 13-14, 19-20.)

After verbally completing the health history questionnaire with an employee, Plaintiff and the employee remain in the privacy booth and complete the health screening. (See Bartell Decl. (Doc. 52-3) ¶ 21.) After this step Plaintiff is taken to the donation floor for plasmapheresis. (Id. ¶¶ 21-22.) In contrast, after other donors complete the health history questionnaire at the kiosk, they must wait for a staff member to escort them to a privacy booth for the health screening. (See Becker Decl. (Doc. 52-6) ¶ 14.)

From August 2019 until December 2020, Plaintiff's service animal accompanied her through all stages of the donation process. (Bartell Decl. (Doc. 52-3) ¶¶ 12, 23-24.) During plasmapheresis, Plaintiff's service animal would lay "on the opposite side of [her] donor chair from the plasma machine" and "was on leash and under [her] verbal command throughout the plasma donation process." (Suppl. Bartell Decl. (Doc. 27-1) ¶¶ 9-10.) Plaintiff's "service animal never interfered with the plasma donation process," and "[t]he donation center staff frequently told [Plaintiff] that [her] service animal is one of the best service animals they encountered." (Id. ¶¶ 11, 13.)

C.  **Denial of Plaintiff's Service Animal**

In December 2020, "Grifols wholly acquired IBBI[,] and IBBI began implementing Grifols' health and safety standards."

- 7 -

(Becker Decl. (Doc. 52-6) ¶ 6.) One of Grifols' policies was to
"prohibit . . . service animals from entering the donor floor."
(Id. ¶ 23.) Defendants' stated reason for the policy was to
"protect the collection materials and collected plasma from
microbial and other contamination and [to protect] the safety of
staff and donors, whether that be through risk of infection or
posing tripping hazards." (Id. ¶ 24.)

In line with this policy, staff at the PDC told Plaintiff
that her service animal could not accompany her onto the donor
floor on December 24, 2020. (Bartell Decl. (Doc. 52-3) ¶ 23.) In
response, Plaintiff showed one of Defendants' employees
information about the rights of people with service animals
under the ADA. (Doc. 64-5 at 4-5.) Plaintiff's counsel also
wrote demand letters to the PDC's Center Manager (see Cunningham
Decl. (Doc. 59-3) ¶ 2), stating that the exclusion of service
animals from the donor floor is discriminatory. (See Docs. 64-6,
64-7.)

Grifols' Assistant General Counsel responded that service
animals were excluded from the donor floor "to ensure the health
and safety of the donors and employees, as well as the integrity
and quality of the plasma." (Doc. 64-8 at 3.) Plaintiff's
counsel replied that "[t]he law requires that [Plaintiff] be

- 8 -

permitted to bring her service animal to all stages of her plasma donation appointment." (Doc. 64-9 at 2.)

Plaintiff subsequently sought a preliminary injunction against Defendants' policy. (Mot. for Prelim. Inj. (Doc. 5).) This court granted Plaintiff's motion for a preliminary injunction in part and ordered Defendants to "make accommodations to their policies to permit Plaintiff to donate plasma while being assisted by her service animal." (Mem. Op. and Order (Doc. 36) at 38.) In reaching this conclusion, this court relied on the following facts regarding the possibility of disease transmission from a service animal during a plasma donation.

> 26. Dogs can transmit organisms to humans and vice versa, but "[n]ot all organisms are transmissible between species." (Douglas Decl. (Doc. 27-2) ¶ 12.)
> 27. The main way a human can become infected "from a dog is via ingestion of urine, feces, or saliva from an infected dog." (Id. ¶ 13.)
> 28. Because "[p]lasma donation utilizes a 'closed system,' . . . [t]o contaminate the plasma, an infected dog . . . would have to perform a behavior such as licking the needle being used." (Id. ¶ 15.)
> 29. Keeping a dog laying on the ground or seated should eliminate the risk of contaminating the plasma. (Id.)

(Mem. Op. and Order (Doc. 36) at 7–8.)

This court ultimately concluded that Defendants had proffered no evidence that "Plaintiff's service animal is a direct threat to safety, would fundamentally alter the nature of

- 9 -

[Defendants'] service, and is not under control." (Id. at 22.)
Additionally, this court rejected Defendants' argument that
federal regulations compelled the exclusion of the service
animal from the donor floor. (Id. at 20-21.)

D.    **Defendants Change Their Policy**

Defendants adopted a new nationwide policy for donors with
service animals on July 19, 2022. (Becker Dep. (Doc. 52-16)
at 13, 16; see also Doc. 52-26.)[2] The policy required donors who
wished to be accompanied by their service animal to complete
their donation appointments in a private exam room; after their
appointment, their donation would be discarded as waste.
(Doc. 52-13 at 11, 20.)

Upon learning of the modified policy, Plaintiff filed a
motion to enforce the preliminary injunction contending that
Defendants' new policy ran afoul of the court's preliminary
injunction order. (Mot. to Enforce Prelim. Inj. (Doc. 39) at 2.)
This court held a Motions Hearing on the motion to enforce.
(Minute Entry 10/28/2022.) This court found that the new policy
did not violate the court's preliminary injunction, which
ordered Defendants to "make accommodations to their policies to
permit Plaintiff to donate plasma while being assisted by her

_____

[2] Defendants modified their policy shortly before this court
granted in part Plaintiff's Motion for a Preliminary Injunction
on August 15, 2022. (Mem. Op. and Order (Doc. 36).)

service animal." (Mem. Op. and Order (Doc. 36) at 38; <u>see also</u> Minute Entry 10/28/2022.) However, this court also expressed concern with Defendants' decision to discard Plaintiff's plasma as waste, particularly given the absence of evidence that the policy was necessitated by any regulations or evidence-based health and safety concerns. (<u>See</u> Hr'g Tr. (Doc. 68) at 10–17.)

E.    **Defendants Revert to the Original Service Animal Policy**

Following the Motions Hearing, Defendants revised their policy again. Their new "policy permits all vision-impaired donors with service animals to donate plasma on the donor floor, accompanied by their service animal, alongside other donors. The collected donation will then be treated the same as any other donation." (Bolger Decl. (Doc. 62-2) ¶ 5; <u>see also</u> <u>id.</u> at 5–17.) The policy went into effect on December 20, 2022. (<u>Id.</u> at 3.) Plaintiff successfully donated plasma with her service animal on the donor floor on January 15, 2023. (Suppl. Bartell Decl. (Doc. 64-4) ¶¶ 4–5, 7.)

II.  **PROCEDURAL HISTORY**

Plaintiff filed her complaint in this action on December 16, 2021, (Doc. 1), and subsequently filed a corrected complaint, (Compl. (Doc. 2)). Plaintiff also requested a preliminary injunction. (Mot. for Prelim. Inj. (Doc. 5).)

- 11 -

Plaintiff's motion asked this court to "require[] Defendants to: (1) [m]odify or make accommodations to their policies to permit Plaintiff to donate plasma while being assisted by her service animal; and (2) [u]tilize accessible kiosks for their pre-donation paperwork and to provide Plaintiff with accessible, alternate formats of its print communications." (Id. at 2-3.) In granting Plaintiff's motion in part, this court ordered "that Defendants shall make accommodations to their policies to permit Plaintiff to donate plasma while being assisted by her service animal." (Mem. Op. and Order (Doc. 36) at 38.) This court declined to decide whether Defendants provided effective communication because of unresolved factual issues and directed the parties to outline how they wished to proceed on this issue. (Id. at 28-29, 38.)

Following this court's preliminary injunction order, Defendants filed a notice of compliance stating they had amended their service animal policy. (Doc. 37.) Plaintiff subsequently filed a motion to enforce the preliminary injunction, claiming, inter alia, that Defendants' new policy failed to comply with this court's preliminary injunction. (Mot. to Enforce Prelim. Inj. (Doc. 39).)

On October 28, 2022, this court held a Motions Hearing. (See Minute Entry 10/28/2022.) At the Hearing, this court stayed

- 12 -

the dispositive motion deadline for 14 days to allow the parties to determine if they could reach agreement on whether additional discovery or amendment of the pleadings was required. (Hr'g Tr. (Doc. 68) at 36.) This court also denied the motion to enforce the preliminary injunction and declined to issue a preliminary injunction on Plaintiff's effective communication claim. (Minute Entry 10/28/2022; see also Hr'g Tr. (Doc. 68) at 34-35.)

Following the Hearing, Plaintiff filed a Motion for Summary Judgment, (Pl.'s Partial Mot. for Summ. J. ("Pl.'s MSJ") (Doc. 52)), and a brief in support, (Mem. of Law in Supp. of Pl.'s Partial Mot. for Summ. J. ("Pl.'s MSJ Br.") (Doc. 53)). Defendants responded to the motion. (Defs.' Resp. in Opp'n to Pl.'s Partial Mot. for Summ. J. ("Defs.' Resp.") (Doc. 62).) Plaintiff filed a reply. (Reply in Supp. of Pl.'s Partial Mot. for Summ. J. ("Pl.'s Reply") (Doc. 64).)

Defendants also filed a Motion for Summary Judgment, (Partial Mot. for Summ. J. ("Defs.' MSJ") (Doc. 58)), and a brief in support, (Mem. of Law in Supp. of Defs.' Partial Mot. for Summ. J. ("Defs.' MSJ Br.") (Doc. 59)). Plaintiff responded in opposition. (Pl.'s Resp. in Opp'n to Defs.' Partial Mot. for Summ. J. ("Pl.'s Resp.") (Doc. 63).) Defendants filed a reply. (Reply in Supp. of Defs.' Partial Mot. for Summ. J. ("Defs.' Reply") (Doc. 65).) Plaintiff subsequently filed a Motion for

- 13 -

Leave to File a Surreply. (Pl.'s Mot. for Leave to File a Surreply ("Pl.'s Surreply Mot.") (Doc. 66).)

The cross-motions for summary judgment and Plaintiff's Motion for Leave to File a Surreply are ripe for adjudication.

## III. **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . ., the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 719 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). Summary judgment should be granted "unless a reasonable jury could return a verdict in favor of the nonmovant on the evidence

presented." McLean, 332 F.3d at 719 (citing Liberty Lobby, 477 U.S. at 247–48).

When facing cross-motions for summary judgment, this court reviews "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol, 316 F.3d 516, 523 (citations and internal quotation marks omitted). "When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. (citation and internal quotation marks omitted).

## IV. **ANALYSIS**

### A. **Plaintiff's Motion to File a Surreply**

This court first considers Plaintiff's Motion for Leave to File a Surreply. (Pl.'s Surreply Mot. (Doc. 66).) In this district, reply briefs are "limited to discussion of matters newly raised in the response." Local Rule 7.3(h). "Courts in this district . . . have consistently held that reply briefs . . . may not inject new grounds for argument." Pouncey v. Guilford Cnty., No. 1:18CV1022, 2020 WL 1274264, at *5 (M.D.N.C. Mar. 17, 2020) (cleaned up). This rule "exists to give the replying party a chance to rebut newly raised arguments, not to give the replying party an unfair advantage in having a

- 15 -

chance to make new arguments that should have been raised initially." Id. (citations omitted).

Plaintiff claims a surreply is necessary to address the argument Defendants' raised in their reply "that Plaintiff was never excluded from donating plasma." (See Pl.'s Surreply Mot. (Doc. 66) at 2-3 (quoting Defs.' Reply (Doc. 65) at 15-16).) Defendants oppose Plaintiff's motion but have indicated they will not file a response in opposition. (Id.)

This court agrees with Plaintiff that a surreply on this narrow issue is appropriate. Defendants' summary judgment brief argued that Plaintiff proffered insufficient evidence of deliberate indifference. (See Defs.' MSJ Br. (Doc. 59) at 29-30.) Defendants' reply brief added that Plaintiff has failed to show she was excluded from donating blood because she continued to donate despite Defendants' policy changes. (See Defs.' Reply (Doc. 65) at 15-16.) In doing so, Defendants "inject[ed] new grounds' for argument." Pouncey, 2020 WL 1274264, at *5 (internal quotation marks and citation omitted). Therefore, this court will grant Plaintiff's motion to file a surreply, (Pl.'s Surreply Mot. (Doc. 66)), and will consider Plaintiff's attached proposed surreply accordingly, (see Surreply (Doc. 66-1)).

**B.    Cross-Motions for Summary Judgment**

**1.    Declaratory and Injunctive Relief**

Plaintiff asks this court to issue a declaratory judgment that Defendants violated the ADA and the Rehabilitation Act by denying her the assistance of her service animal on the plasma donation floor and all other areas of Defendants' facilities where donors are allowed to go."[3] (Pl.'s MSJ (Doc. 52) at 2-3.) Plaintiff also seeks a permanent injunction ordering Defendants to permit her "the assistance of her service animal on the plasma donation floor and all other areas of Defendants' facilities where donors are allowed to go."[4] (See id.) Defendants do not object to a declaratory judgment or permanent injunction so long as the language of the court's order is consistent with the relief requested in Plaintiff's complaint. (Defs.' Resp. (Doc. 62) at 11.)

"A party seeking a permanent injunction must demonstrate 'actual success' on the merits, rather than a mere 'likelihood of success' required to obtain a preliminary injunction. Mayor

---

[3] As this court will deny Plaintiff's motion on her effective communication claim and grant Defendants' motion on that claim, (see infra Section IV.B.2), this court will also deny Plaintiff's motion for declaratory and injunctive relief as it relates to that claim.

[4] This court assumes Plaintiff seeks injunctive relief in the same language as her declaratory relief.

of Baltimore v. Azar, 973 F.3d 258, 274 (4th Cir. 2020). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court . . . ." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). Before a court may grant a permanent injunction, the plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury;
> (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;
> (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and
> (4) that the public interest would not be disserved by a permanent injunction.

Id.

This court first considers whether Plaintiff is entitled to a permanent injunction on the same terms as the previously issued preliminary injunction. Analysis of this issue is largely the same as that contained in this court's prior order on Plaintiff's motion for a preliminary injunction. (See Mem. Op. and Order (Doc. 36) at 12–23.) While the preliminary injunction order evaluated the facts and legal contentions under the "likely to succeed on the merits standard," (see id. at 10–12), the analysis demonstrates that, in the absence of other evidence, Plaintiff was entitled to judgment as a matter of law on this claim. As such, the Court finds no need to reiterate the

entire analysis in full within this Memorandum Opinion, and will instead incorporate by reference that analysis herein.[5]

This court expands on the analysis in the preliminary injunction order as follows. Defendants argued in their response to Plaintiff's motion to enforce the preliminary injunction that allowing service animals on the donor floor could "jeopardize[] their ability to provide plasma-based therapeutics in [European] markets." (See Resp. to Mot. to Enforce (Doc. 43) at 22.) Specifically, James Knowles, a Biomat employee, explained that "[t]he European Medicines Agency ("EMA") is a decentralized agency of the [European Union ("EU")] that "requires that plasma-derived therapeutics only utilize source plasma from PDCs that comply with EU" regulations. (Knowles Decl. (Doc. 43-1) ¶¶ 1-2, 11-12.) To ensure compliance with EU regulations, "the EMA requires that PDCs be certified. Without certification of the PDC, the EMA will not permit the plasma to be used in plasma-derived therapeutics on the European market." (Id. ¶ 13.)

---

[5] The only evidence that has been presented since the court issued its preliminary injunction order that could undermine that order's analysis is Defendants' argument that European regulators may object to collecting plasma in the presence of a service animal. (See Defs.' Resp. in Opp'n to Pl.'s Mot. to Enforce ("Resp. to Mot to Enforce") (Doc. 43) at 8-11.) However, as this court will explain, Defendants' speculative allegations do not create a genuine factual dispute.

- 19 -

"To become certified, a PDC must pass an inspection of its facility and policies." (Id. ¶ 14.) The EMA does not conduct inspections itself; instead, "[t]he entity used for inspection and certification typically depends on the country of import destination." (Id. ¶¶ 15, 17.) As Grifols' plasma is manufactured in Spain, its "PDCs are inspected, audited, and certified by the Spanish regulatory agency Agencia Española de Medicamentos y Productos Sanitarios ('AEMPS')." (Id. ¶ 19.) Based on his experience in the industry, Mr. Knowles concluded "that AEMPS may consider the collection of plasma in the presence of any animal to be a violation of European Regulations. If AEMPS discovers that a PDC collects plasma in the presence of an animal, . . . AEMPS might not certify that PDC's plasma for use in European markets." (Id. ¶ 21.)

Defendants failed to cite any regulations or guidance from the EMA or AEMPS supporting Mr. Knowles' conclusion that collecting plasma in the presence of a service animal could compromise the Asheville PDC's certification. Instead, Defendants' employees, including Mr. Knowles, testified during their depositions that they never consulted with AEMPS about whether collecting plasma in the presence of a service animal would violate EMA regulations. (See Becker Dep. (Doc. 52-16)

at 15–18; Knowles Dep. (Doc. 52-19) at 9-10; Bolger Dep. (Doc. 52-13) at 18–19.)

"[U]nsupported speculation is not sufficient to defeat a summary judgment motion." Smith v. Schlage Lock Co., LLC, 986 F.3d 482, 486 (4th Cir. 2021). Defendants' unsupported claim that allowing Plaintiff to donate plasma in the presence of her service animal will draw the ire of European regulators is insufficient to prevent Plaintiff from prevailing on the merits. Considering this analysis, as well as the analysis presented in this court's prior preliminary injunction order, (Mem. Op. and Order (Doc. 36)), this court finds that Plaintiff has demonstrated actual success on the merits of her claim "that Defendants violate Title III of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act by denying Plaintiff the right to be accompanied by her service animal at all times while donating plasma." (See Compl. (Doc. 2) at 19.)

Having shown actual success, this court now considers whether Plaintiff has satisfied the four-factor test for a permanent injunction. This court finds she has.

The first factor asks whether the plaintiff "has suffered an irreparable injury." eBay Inc., 547 U.S. at 391. Courts have held that when a defendant violates a civil rights statute, such as the ADA, irreparable injury is presumed. See Pathways

Psychosocial v. Town of Leonardtown, 223 F. Supp. 2d 699, 717 (D. Md. 2002) (recognizing violation of Title II of the ADA and Section 504 of the Rehabilitation Act created a presumption of irreparable injury); see also Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 827 (9th Cir. 2001) ("We have held that where a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation."); Burlington N.R.R. Co. v. Dep't of Revenue of State of Wash., 934 F.2d 1064, 1074 (9th Cir. 1991) ("The standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief."); Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1423 (11th Cir. 1984) (holding "irreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes"). Here, Plaintiff has demonstrated Defendants violated civil rights statutes — the ADA and Rehabilitation Act — so irreparability may be presumed. See, e.g., Pathways Psychosocial, 223 F. Supp. 2d at 717. Additionally, while Defendants currently allow Plaintiff to donate in the presence of her service animal, (see Bolger Decl. (Doc. 62-2) ¶ 5), they

- 22 -

may abandon this policy at any time, and in doing so, start violating Plaintiff's rights again.

Second, Plaintiff must show "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury." eBay Inc., 547 U.S. at 391. Plaintiff correctly notes that damages are inadequate because they cannot ensure Plaintiff will be able to donate plasma in the presence of her service animal in the future. (Pl.'s MSJ Br. (Doc. 53) at 27.)

Third, Plaintiff is required to establish "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted." eBay Inc., 547 U.S. at 391. As Defendants currently permit Plaintiff to donate plasma with her service animal, (Bolger Decl. (Doc. 62-2) ¶ 5), requiring Defendants to continue allowing Plaintiff to donate in the presence of her service animal is not a hardship. By contrast, Plaintiff has already demonstrated irreparable harm in the absence of a preliminary injunction.

Fourth, Plaintiff must show "that the public interest would not be disserved by a permanent injunction." eBay Inc., 547 U.S. at 391. "[T]he public interest lies with upholding the law and having the mandates of the ADA and Rehabilitation Act enforced." Marlo M. ex rel. Parris v. Cansler, 679 F. Supp. 2d 635, 638 (E.D.N.C. 2010). A permanent injunction is in the public

- 23 -

interest because it will prevent Defendants from reverting to a policy that violated antidiscrimination laws.

Therefore, this court determines that Plaintiff is entitled to a declaratory judgment that Defendants violate Title III of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act by denying Plaintiff the right to be accompanied by her service animal at all times while donating plasma. Likewise, a permanent injunction ordering Defendants to permit Plaintiff to donate plasma while being assisted by her service animal, is appropriate and shall be issued.

Plaintiff asks this court to go further than this injunctive relief, which mirrors the language in her complaint and motion for a preliminary injunction. (See Compl (Doc. 2) at 20 (seeking "[a]n injunction ordering Defendants to . . . adopt[] and implement[] policies of nondiscrimination against persons who use service animals and/or to mak[e] reasonable modifications to existing policies, practices, and procedures to ensure that individuals with disabilities are not unlawfully denied assistance from their service animal during the plasma donation process."); Mot. for Prelim. Inj. (Doc. 5) at 2–3 (requesting that this court "[i]ssue a Preliminary Injunction requiring Defendants to . . . [m]odify or make accommodations to their policies to permit Plaintiff to donate plasma while being

assisted by her service animal").) Plaintiff now seeks a permanent injunction preventing Defendants from "denying [Plaintiff] the assistance of her service animal on the plasma donation floor and all other areas of Defendants' facilities where donors are allowed to go." (See Pl.'s MSJ (Doc. 52) at 2-3.)

Plaintiff seeks this relief to prevent Defendants from reverting to two prior policies: one that required Plaintiff to donate on the donor floor without her service animal, (Becker Decl. (Doc. 52-6) ¶¶ 23-25; see also Doc. 52-27 at 6), and a second that permitted Plaintiff to donate in a separate room with her service animal, (see Doc. 52-26 at 3-4). When Plaintiff commenced this litigation, the first policy was in effect. Therefore, the briefing on and order granting Plaintiff's motion for a preliminary injunction only addressed whether that policy violated the ADA and Rehabilitation Act. The parties were never asked to address whether Defendants' policy of allowing Plaintiff to donate in a separate room with her service animal

violated Plaintiff's rights.[6] Now, Defendants have abandoned this policy and allow Plaintiff to donate on the donor floor with her service animal. (See Bolger Decl. (Doc. 62-2) ¶ 5.)

"Because of notice pleading rules, courts may only consider legal claims that a plaintiff has made in his complaint." Bartels v. Saber Healthcare Grp., LLC, No. 5:16-CV-283-BO, 2022 WL 263564, at *2 (E.D.N.C. Jan. 27, 2022) (citing Barclay White Skanska, Inc. v. Battelle Mem. Inst., 262 F. App'x 556, 563 (4th Cir. 2008) (unpublished)). "[D]espite the liberal pleading rules outlined by the Supreme Court, plaintiffs may not raise new claims without amending their complaints after discovery has begun." Barclay White Skanska, Inc., 262 F. App'x at 563.

Plaintiff's complaint requested an injunction requiring Defendants to "adopt[] and implement[] policies of nondiscrimination against persons who use service animals and/or to mak[e] reasonable modifications . . . to ensure that individuals with disabilities are not unlawfully denied

---

[6] Defendants' response to Plaintiff's motion to enforce the preliminary injunction briefly argued the merits of why a preliminary injunction ordering Defendants to permit Plaintiff and her service animal to access the donor floor should fail. (See Resp. to Mot to Enforce (Doc. 43) at 18–26.) However, Defendants spent much of the response making procedural arguments, (id. at 13–15), and this court ultimately agreed that whether Defendants' revised policy violated the ADA and Rehabilitation Act was not properly raised on the motion to enforce. (See Hr'g Tr. (Doc. 68) at 33–34.)

assistance from their service animal during the plasma donation
process." (Compl. (Doc. 2) at 20 (emphasis added).) Plaintiff's
instant motion seeks different relief — a permanent injunction
preventing Defendants from "denying [Plaintiff] the assistance
of her service animal on the plasma donation floor and all other
areas of Defendants' facilities where donors are allowed to go."
(See Pl.'s MSJ (Doc. 52) at 2–3 (emphasis added).) Plaintiff's
complaint only requested she be able to access the donor floor
and made no mention of other locations in Defendants'
facilities. (See id.) Now she seeks access to the donor floor,
as well as "all other areas of Defendants' facilities where
donors are allowed to go," even though these "other areas," and
Plaintiff's reason for accessing them, remain unspecified. (See
id.)

    As Plaintiff's complaint seek access to all other areas of
Defendants' facilities where donors are allowed to go," (id.),
she must amend her complaint to request this new relief. To
require otherwise would subvert the notice pleading requirements
of Federal Rule of Civil Procedure 8(a) as Defendants would lack
an adequate chance to address the claims against them.
Plaintiff's reply "disputes the necessity of amending her
complaint" but requests that she be given leave to amend if this

court deems it necessary to obtain the relief she seeks. (Pl.'s MSJ Reply (Doc. 64) at 7 n.2.)

Federal Rule of Civil Procedure 15(a)(1) allows a party to amend its pleading once as a matter of course under certain circumstances not applicable here. Otherwise, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires[,]" id., denying leave "only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (citation and internal quotation marks omitted). "A common example of a prejudicial amendment is one that 'raises a new legal theory that would require the gathering and analysis of facts not already considered by the defendant, and is offered shortly before or during trial.'" Id. at 427 (internal citation omitted)).

Permitting Plaintiff to amend her complaint at this stage of the proceedings would prejudice Defendants. Discovery in this case has concluded. The central legal issue is whether Defendants can show that an exception applies to Plaintiff's right to be accompanied by her service animal while donating plasma. (See Mem. Op. and Order (Doc. 36) at 12-23.) The

litigation has not addressed whether Plaintiff's right to be accompanied extends to every single part of Defendants' facilities where donors are permitted to go. Even if the legal calculus remains the same, discovery would be necessary to create a comprehensive record of "all areas of Defendants' facilities where donors are allowed to go" and to determine if Defendants have valid reasons for excluding service animals from any of those areas. Requiring the parties to reopen discovery at this stage would prejudice Defendants. Therefore, this court will issue a permanent injunction on the same terms as its prior preliminary injunction.[7]

### 2. Effective Communication

Plaintiff and Defendants also move for summary judgment on Plaintiff's claim that Defendants deprived her of effective

---

[7] To illustrate the problems associated with Plaintiff's failure to amend before requesting relief and the problems associated with granting relief which has not been previously requested, this court has considered various issues associated with Plaintiff's broad request. There are conceivable circumstances under which Plaintiff's requested relief is not in the public interest. While not a part of this record, this court is aware of individuals who are allergic to dogs and dog hair. There are individuals who do not like dogs or other pets. An order of the type requested by Plaintiff would arguably interfere with Defendants' ability to accommodate other potential donors who may feel differently around dogs and service animals. On the record before this court, Plaintiff's right to the new, broad, relief she requests has not been established, nor does it appear Plaintiff's right to that relief could be established.

communication by requiring her to use a qualified reader to complete the health history questionnaire in step one of the plasma donation process. (Pl.'s MSJ Br. (Doc. 53) at 23–28; Defs.' MSJ Br. (Doc. 59) at 8, 10–28.) This court will grant Defendants' motion and deny Plaintiff's motion on this issue.

### a. Defendants' Motion for Summary Judgment

A public accommodation discriminates against an individual with a disability when it

> fail[s] to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. § 12182(b)(2)(A)(iii); see also 28 C.F.R. § 36.303(a) ("A public accommodation shall take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the public accommodation can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden, i.e., significant difficulty or expense.").

Examples of appropriate aids for the visually impaired include
"[q]ualified readers," "accessible electronic and information
technology," "audio recordings," "screen reader software," and
the "[a]cquisition or modification of equipment or devices."
28 C.F.R. § 36.303(b)(2)-(3).

"Title III and its implementing regulations require public
accommodations to furnish 'appropriate auxiliary aids and
services where necessary to ensure effective communication with
individuals with disabilities.'" Nat'l Fed. of the Blind, Inc.
v. Wal-Mart Assocs., Inc., 566 F. Supp. 3d 383, 399 (D. Md.
2021) (quoting 28 C.F.R. § 36.303(c)(1)). "[T]he type of
auxiliary aid that ensures 'effective communication' varies by
context." Feldman v. Pro. Football, Inc., 419 F. App'x 381, 391
(4th Cir. 2011).

> The type of auxiliary aid or service necessary to
> ensure effective communication will vary in accordance
> with the method of communication used by the
> individual; the nature, length, and complexity of the
> communication involved; and the context in which the
> communication is taking place. A public
> accommodation should consult with individuals with
> disabilities whenever possible to determine what type
> of auxiliary aid is needed to ensure effective
> communication, but the ultimate decision as to what
> measures to take rests with the public accommodation,
> provided that the method chosen results in effective
> communication. In order to be effective, auxiliary
> aids and services must [1] be provided in accessible
> formats, [2] in a timely manner, and [3] in such a way
> as to protect the privacy and independence of
> the individual with a disability.

28 C.F.R. § 36.303(c)(1)(ii).

Defendants argue that the auxiliary aids they provide — qualified readers — are accessible to Plaintiff and that they are sufficiently timely, private, and independent to pass muster under the statute. (Defs.' MSJ Br. (Doc. 59) at 19–28.) Plaintiff disagrees, arguing that the readers are insufficiently timely, private, and independent, and fail to provide her with a "like experience." (Pl.'s Resp. (Doc. 63) at 8–23.)

As an initial matter, Defendants have chosen to provide qualified readers to visually impaired donors to communicate the information contained in the health history questionnaire and record the donor's responses. (See Cunningham Decl. (Doc. 59–3) ¶ 3; Bartell Decl. (Doc. 52–3) ¶ 35.) "Qualified readers" are a recognized auxiliary aid for "individuals who are blind or have low vision." 28 C.F.R. § 36.303(b)(2). As a public accommodation, Defendants are permitted to choose the auxiliary aid they provide, and this court will not disrupt that choice so long as the aid "results in effective communication." 28 C.F.R. § 36.303(c)(1)(ii). To determine whether the qualified readers result in effective communication, this court must determine if they are "[1] provided in accessible formats, [2] in a timely

manner, and . . . [3] protect the privacy and independence of the individual with a disability."[8] Id.

Plaintiff does not dispute that the health questionnaire is accessible when read to her by Defendants' employees. Plaintiff testified she "understand[s] and comprehend[s] everything" the readers tell her. (Defs.' Excerpts Bartell Dep. (Doc. 59-2) at 13-14.) Thus, by her own admission, the format of the communication allows Plaintiff to comprehend what is being asked and provide an answer. There is no allegation that the readers have been unavailable or unwilling to read the questionnaire. (See Defs.' Resp. (Doc. 62) at 18-19.)

i.  **Timeliness**

Plaintiff argues that the readers are not timely because she "must wait for a staff member to become available to complete the health history questionnaire" and "it takes her at least fifteen more minutes to complete the questionnaire than it takes her sighted partner to complete the questionnaire at the

_____

[8] Plaintiff notes that "recipients of federal financial assistance from DHHS must give primary consideration to [the] requested auxiliary aid or service." (Pl.'s MSJ Br. (Doc. 53) at 23 (emphasis added).) However, Plaintiff also admits that she lacks evidence that Defendants receive funding from DHHS. (See Pl.'s MSJ Reply (Doc. 64) at 8 n.3.) Additionally, the regulatory guidance explains that "the Department [of Justice] believes that Congress did not intend under title III to impose upon a public accommodation the requirement that it give primary consideration to the request of the individual with a disability." 28 C.F.R. Pt. 36, App. C.

kiosk." (Pl.'s Resp. (Doc. 63) at 15.) Defendants contend timeliness concerns apply only in time-sensitive contexts, that any time difference is negligible, and that Plaintiff's preferred aid "would result in the same or similar delay." (Defs.' MSJ Br. (Doc. 59) at 19–21.)

Although "timeliness" may be read broadly, it appears to this court that at a minimum, timeliness requires consideration of how long it takes to procure the auxiliary aid and how much longer using the aid requires in comparison to others who do not use the aid while bearing in mind the requirement that auxiliary aids must result in effective communication. See 28 C.F.R. § 36.303(c)(1)(ii). Communication is not effective if it takes an unreasonable time to commence or if communicating via the aid takes an unreasonable amount of time.

That Plaintiff waits for a staff member to take her to the privacy booth does not impact the timeliness of the communication. Donors unable to use the kiosks wait for a staff member to take them to the privacy booth where they complete the health history questionnaire and health screening. (See Bartell Decl. (Doc. 52-3) ¶ 34 (Plaintiff must "wait for a staff member to become available to complete the check in process").) By comparison, sighted donors complete the health history questionnaire on the kiosks immediately upon arrival, but then

- 34 -

must wait for a staff member to take them to the privacy booth for their health screening. (See Becker Decl. (Doc. 52-6) ¶¶ 13-14.) As all donors must wait for a staff member, when during the process they do the waiting has no impact on the total length of the donation process. Plaintiff has not presented facts to suggest that an initial delay in waiting for a staff member (as opposed to waiting for a staff member after using the kiosk) lengthens the total donation process.

However, the timeliness inquiry is arguably implicated because it takes Plaintiff approximately twenty minutes to complete the health history questionnaire with a qualified reader, while it takes her sighted companion three to five minutes to complete the questionnaire using the kiosk. (Compare Defs.' Excerpts Bartell Dep. (Doc. 59-2) at 14, with Holloway Decl. (Doc. 52-11) ¶¶ 9, 11.) Nonetheless, this court finds the fifteen minute disparity does not render the qualified readers' communication untimely.

First, there is no evidence that Plaintiff would complete the questionnaire more quickly with an alternative auxiliary aid. Plaintiff's "accessible kiosk expert did not address the amount of time it would take a blind individual to complete the health history questionnaire on an accessible kiosk." (Pl.'s Resp. (Doc. 63) at 15.) Likewise, while Defendants claim a

- 35 -

screen reader would "clearly" "take just as much time – if not longer – than a human reading the questionnaire," they provide no evidence for their speculative argument. (See Defs.' MSJ Br. (Doc. 59) at 22.) In the absence of evidence that there is a faster way for Plaintiff to check in, this court is unwilling to find that Defendants' auxiliary aid is untimely.

Additionally, this court is not persuaded a fifteen minute delay to donate plasma renders the qualified readers untimely. In selecting an appropriate auxiliary aid, public accommodations consider "the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 36.303(c)(1)(ii). The "nature [and]. . . context" of the communication, id., impact the speed at which the information needs to be

- 36 -

communicated.[9] Here, the communication enables Plaintiff to donate plasma. Donating plasma is an entirely optional activity Plaintiff engages in. There is no evidence that the fifteen minute delay in that process has impeded Plaintiff's ability to engage in this activity or otherwise caused her more than a minor inconvenience.

Additionally, the regulatory guidance implies that auxiliary aids are permissible even when they take longer to communicate the information than another aid would. The guidelines provide that:

> a restaurant would not be required to provide menus in Braille for patrons who are blind, if the waiters in the restaurant are made available to read the menu. Similarly, a clothing boutique would not be required to have Brailled price tags if sales personnel provide price information orally upon request; and a bookstore

---

[9] This court disagrees with Defendants' assessment that timeliness concerns are "inapplicable" where the communication is not "urgent." (See Defs.' MSJ Br. (Doc. 59) at 19–20.) The regulatory guidance states:

> advocacy groups . . . urged the Department to add language in the final rule requiring the provision of accessible material in a manner that is timely, accurate, and private. This, they argued, would be especially important with regard to billing information, other time-sensitive material, or confidential information."

28 C.F.R. Pt. 36, App. A. (emphasis added). That timeliness would be "especially important" for bills and other time-sensitive material does not render timeliness irrelevant in other contexts. This guidance supports this court's conclusion that the nature and context of the conversation impacts how timely the communication should be.

would not be required to make available a sign
language interpreter, because effective communication
can be conducted by notepad.

28 C.F.R. Pt. 36, App. C. Presumably, braille menus and price
tags or sign language interpreters would convey information more
quickly than waiters reading the entire menu aloud or asking
shopkeepers to read price tags on demand or communicating with
bookstore employees via notepad. However, the regulations
endorse qualified readers in these situations in lieu of
potentially faster alternative auxiliary aids. (See id.) As
such, this court is not persuaded that an auxiliary aid is only
timely if it communicates as quickly as possible.

### ii.  Privacy and Independence

Next, Plaintiff argues the qualified readers fail to
adequately protect her privacy and independence. (Pl.'s Resp.
(Doc. 63) at 16–22.) Defendants disagree. (Defs.' MSJ Br.
(Doc. 59) at 23–28.) The gravamen of Plaintiff's privacy
argument is that during the health history questionnaire, she is
required to verbally disclose "her full name, birthdate, social
security number, sexual history, medical history, and other
personal information out loud." (Pl.'s Resp. (Doc. 63) at 17.)
This fact is insufficient to sustain Plaintiff's argument that
Defendants' communication fails to safeguard her privacy for two
reasons.

- 38 -

First, blind donors are not the only individuals who complete the health history questionnaire orally in the privacy booths. Donors who are illiterate or otherwise unable to use the kiosks also complete the questionnaire verbally in the privacy booths. (Cunningham Decl. (Doc. 59-3) at ¶¶ 4-5.) "Additionally, sighted donors who are able to read printed material sometimes provide medical information in the privacy booth if they have a question about a portion of the health history questionnaire or if one of their responses triggered necessary follow-up to determine their eligibility." (Id. ¶ 6.) Moreover, all donors who move to the third stage of the process submit to a health screening in the privacy booth where their "weight, blood pressure, pulse and temperature are measured, and a blood sample is collected to test for total protein and hematocrit." (Becker Decl. (Doc. 22-1) ¶ 14; see also Bartell Decl. (Doc. 52-3) ¶ 21.) Therefore, any donor may be required to provide sensitive health information within earshot of others. This undermines Plaintiff's claim that her privacy is uniquely and unacceptably infringed upon by the qualified readers.

Second, there is no evidence in the record that another donor has heard medical information Plaintiff provided in a privacy booth. While Plaintiff stated in her deposition that she has overheard other donors communicating private medical

- 39 -

information in other privacy booths, (Second Bartell Dep. (Doc. 52-14) at 10-11), her testimony is insufficient to raise a genuine dispute of material fact that Plaintiff has been or would be overheard providing medical information in the privacy booths. There is no evidence concerning how frequently Plaintiff has heard other donors disclose medical information, what information they disclosed, or whether those donors were concerned about the disclosure of their medical information.

Plaintiff also argues that special privacy concerns are present in this case because she provides "sensitive, personal information," and "because there is a heightened burden to ensure effective communication 'involving areas such as health, legal matters, and finances.'" (See Pl.'s Resp. (Doc. 63) at 22-23 (cleaned up).) However, as Defendants note, the regulatory guidance Plaintiff cites as recognizing this "heightened burden" is explaining when interpreters, rather than other auxiliary aids, would be required. (Defs.' Reply (Doc. 65) at 11-13 (citing 28 C.F.R. Pt. 36, App. C).) That regulatory guidance states:

> Other situations may also require the use of interpreters to ensure effective communication depending on the facts of the particular case. It is not difficult to imagine a wide range of communications involving areas such as health, legal matters, and finances that would be sufficiently lengthy or complex to require an interpreter for effective communication. In some situations, an

> effective alternative to use of a notepad or an
> interpreter may be the use of a computer terminal upon
> which the representative of the public accommodation
> and the customer or client can exchange typewritten
> messages.

28 C.F.R. Pt. 36, App. C.

This statement provides additional clarity on the language of the regulation that "[t]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 36.303(c)(1)(ii). Public accommodations must consider the "nature" of the communication involved; where the communication involves sensitive health information, that fact may inform the auxiliary aid needed. However, neither the statute, nor the regulatory guidance, set out a "heightened burden" for auxiliary aids to meet when communicating health information.

Additionally, the qualified readers do not impermissibly intrude on Plaintiff's independence for several reasons. One, qualified readers are an accepted auxiliary aid under the statute. See 28 C.F.R. § 36.303(b)(2). While an accessible kiosk or braille forms might allow Plaintiff greater independence, the relevant statute contemplates that qualified readers are

- 41 -

sufficient. Additionally, other courts have upheld the use of qualified readers and staff assistance where the plaintiffs sought accessible kiosks. See Nat'l Fed'n of the Blind, Inc., 566 F. Supp. 3d 383, 403 (D. Md. 2021), appeal dismissed, No. 21-2281, 2022 WL 1562162 (4th Cir. 2022) (rejecting the argument that the defendant needed to utilize accessible kiosks that would be "more independent" than having staff members assist blind customers at inaccessible self-checkout kiosks).

### iii. Full and Equal Enjoyment

In addition to arguing that qualified readers are not sufficiently timely, private, and independent, Plaintiff contends that, in evaluating the appropriate auxiliary aid, "Defendants must focus on providing ones that ensure blind donors have full and equal enjoyment — a 'like experience' — as nondisabled donors." (Pl.'s MSJ Br. (Doc. 53) at 23 (citing Baughman v. Walt Disney World Co., 685 F.3d 1131, 1135 (9th Cir. 2012)); Pl.'s Resp. (Doc. 63) at 9–13.) Plaintiff contends the "like experience" requirement is controlling precedent in the Fourth Circuit. (Pl.'s Resp. (Doc. 63) at 9.)

In J.D. v. Colonial Williamsburg Found., the Fourth Circuit considered a case brought by a gluten intolerant child and his father alleging that a Colonial-themed restaurant violated the child's rights under the ADA by refusing to modify its policies

- 42 -

to allow him to eat a homemade meal in the restaurant. 925 F.3d 663, 672 (4th Cir. 2019). The court considered 42 U.S.C. § 12182 (b)(2)(A)(ii) which concerns a public accommodations' duty "to make reasonable modifications . . . when such modifications are necessary to afford such goods, services, . . . or accommodations to individuals with disabilities." J.D. v. Colonial Williamsburg Found., 925 F.3d at 671 (citing § 12182(b)(2)(A)(ii)). However, in the present case, Plaintiff challenges Defendants' use of qualified readers under 42 U.S.C. § 12182(b)(2)(A)(iii), which concerns a public accommodations' duty to provide auxiliary aids. (See Compl. (Doc. 2) ¶ 67 (citing 42 U.S.C. § 12183 (b)(2)(A)(iii)(emphasis added)); Pl.'s MSJ Br. (Doc. 53) at 23 (citing same).)

A panel of the Fourth Circuit addressed the standards to consider when determining proper auxiliary aids in Feldman v. Pro Football, 419 F. App'x 381, 392 (4th Cir. 2011). In Feldman, the court noted that 42 U.S.C. § 12182(a) "mandates that individuals who visit places of public accommodation . . . may not 'be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.'" 419 F. App'x at 390 (quoting 42 U.S.C. § 12182(a)). In applying this requirement, the Fourth Circuit

- 43 -

found that, "in the context of a professional football game[,] . . . effective communication requires defendants to provide auxiliary aids . . . to convey the: (1) game-related information broadcast over the public address system, . . . (2) emergency and public address announcements . . . and (3) the words to music and other entertainment . . . ." Id. at 391. This content was necessary for the plaintiffs "to have full and equal access to the goods and services that defendants provide." Id. At issue in the case was whether the defendants were required to provide this third category of content, music lyrics, to deaf spectators. Id. at 391-92. The court "emphasize[d]" that it does "not require the auxiliary aids and services to take a particular form." Id. at 392. Instead, "[t]he auxiliary aid requirement is a flexible one." Id. (citing 28 C.F.R. Pt. 36 App. B.). The court added that "'full and equal enjoyment' is not so capacious as to 'mean that an individual with a disability must achieve an identical result or level of achievement as persons without a disability.'" Id.

As Feldman, not J.D. v. Colonial Williamsburg Found., addresses the standards for public accommodations supplying auxiliary aids, this court applies Feldman in analyzing whether Defendants' auxiliary aids are sufficient.

- 44 -

The parties disagree whether the check in questionnaire is essential for Plaintiff's "full and equal enjoyment" of the goods and services Defendants provide. (Compare Defs.' MSJ Br. (Doc. 59) at 18–19, with Pl.'s Resp. (Doc. 63) at 12–13.) However, even assuming it is, Defendants' use of qualified readers is still proper.

As another district court in this circuit noted,

[i]n Feldman, the Fourth Circuit addressed the content that must be communicated through auxiliary aids to provide disabled patrons "full and equal enjoyment" of a defendant's services — and declined to require auxiliary aids in a specific form. Here, the parties do not dispute what information [Defendant] must communicate in order to provide "full and equal enjoyment" of its self-checkout service — only what form of auxiliary aid [Defendant] is required to provide."

Nat'l Fed'n of the Blind, 566 F. Supp. 3d at 403 (emphasis added)(internal citations omitted).

Here, as in National Federation of the Blind, Plaintiff's argument goes to the form of the health history questionnaire, not its content. Both cases are unlike Feldman where the plaintiffs complained that they were denied certain information — music lyrics — because of their disability and the defendant's unwillingness to provide the information in an accessible format.

Considering the preceding analysis, this court finds that Defendants' use of qualified readers to read the health history

questionnaire to Plaintiff and record her responses provides effective communication. Defendants' Partial Motion for Summary Judgment, (Defs.' MSJ (Doc. 58)), will be granted as to Plaintiff's effective communication claim.

### b. <u>Plaintiff's Motion for Summary Judgment</u>

Plaintiff seeks summary judgment on her claim for effective communication for the same reasons she opposed Defendants' motion for summary judgment. (Pl.'s MSJ Br. (Doc. 53) at 23–28.) Plaintiff contends that the qualified readers fail to provide her a like experience, are not timely, and do not safeguard her privacy and independence. (See id.) As this court has concluded the qualified readers are sufficiently timely, private, and independent and provide Plaintiff with "full and equal enjoyment" of Defendants' goods and services, this court will deny Plaintiff's Partial Motion for Summary Judgment, (Pl.'s MSJ (Doc. 52)), as to her effective communication claim.

### 3. <u>Deliberate Indifference</u>

Plaintiff and Defendants each move for summary judgment on Plaintiff's claim for compensatory damages. (See Pl.'s MSJ Br. (Doc. 53) at 28–29; Defs.' MSJ Br. (Doc. 59) at 28–30.) Plaintiff argues Defendants' conduct towards her was deliberately indifferent as a matter of law, therefore she is entitled to damages. (See Pl.'s MSJ Br. (Doc. 53) at 28–29.)

- 46 -

Defendants disagree, contending there is no evidence they acted
with deliberate indifference. (Defs.' MSJ Br. (Doc. 59)
at 28-30.) This court will grant Defendants' motion and deny
Plaintiff's motion on this issue.

### a. <u>Defendants' Motion for Summary Judgment</u>

Defendants argue that "[e]ven if Plaintiff prevails on her
claims for the accompaniment of her service animal or the use of
alternative auxiliary aids," she is not entitled to compensatory
damages because Defendants were not deliberately indifferent.
(Defs.' MSJ Br. (Doc. 59) at 28.) Plaintiff argues she can show
deliberate indifference as a matter of law, or that there is a
genuine dispute of material fact on this issue, because
"Defendants had actual notice of the violation of [Plaintiff's]
federal rights and nonetheless disregarded them." (Pl.'s Resp.
(Doc. 63) at 26-27.)

This court agrees that deliberate indifference is the
proper standard to evaluate whether Plaintiff is entitled to
compensatory damages. To recover monetary damages for a
violation of the ADA or the Rehabilitation Act, a plaintiff must
show intentional discrimination. <u>Koon v. North Carolina</u>, 50
F.4th 398, 404 (4th Cir. 2022) ("[C]ourts largely agree that
compensatory damages are only available to ADA plaintiffs who
prove intentional discrimination.") The Fourth Circuit has used

the deliberate indifference standard to determine whether a
defendant acted with intent to discriminate. See id. (analyzing
an ADA discrimination case under the deliberate indifference
framework after assuming without deciding that standard
applied); Basta v. Novant Health Inc., 56 F.4th 307, 316 (4th
Cir. 2022) (analyzing a prima facie violation of the
Rehabilitation Act under the "'deliberate indifference'
standard" and noting "[m]ost of our sister circuits have also
found that intentional discrimination can be proven via
deliberate indifference").

    "In the ADA context, . . . a two-step deliberate-
indifference test . . . requires: (1) knowledge that a federally
protected right is substantially likely to be violated, and
(2) failure to act despite that knowledge." Koon, 50 F.4th
at 405. The Fourth Circuit "largely agree[s] with that
formulation, with the caveat that a plaintiff must begin by
showing an ongoing or likely violation of a federally protected
right . . . . If there wasn't any ADA violation . . ., there was
nothing to be deliberately indifferent about." Id.

    Defendants' policy that required Plaintiff to donate plasma
without her service animal violated her rights. (Mem. Op. and
Order (Doc. 36) at 12-23; see supra Section IV.B.1 (finding the
court's prior reasoning demonstrates Plaintiff succeeds on the

- 48 -

merits of her claim)). However, this court has determined that Defendants' use of qualified readers to read the health history questionnaire provides effective communication to Plaintiff. (See supra Section IV.B.2.) Therefore, Plaintiff may not seek compensatory damages based on Defendants' refusal to provide alternative auxiliary aids. This court is left to determine whether Defendants were deliberately indifferent with respect to Plaintiff's right to donate plasma while accompanied by her service animal.

> [T]he deliberate-indifference standard starts with determining whether there was — objectively speaking — an ongoing or likely violation of some federal right, and then moves on to determining whether a defendant had the appropriate mental state — subjectively speaking — toward that federal-rights violation. In other words, there is an objective question about rights and duties, and then a follow-up question about subjective mens rea. Was there a violation, and did they know about it?

Koon, 50 F.4th at 404-05 (internal citations omitted). Deliberate indifference is akin to "criminal-law recklessness;" "mere negligence" will not suffice. Id. at 406-07. The defendant "must know of the facts from which a federal-rights violation could be inferred and then actually draw the damning inference." Id. at 407.

A plaintiff may survive summary judgment and present a deliberate indifference argument to the jury based on circumstantial evidence when the risk of violating the

- 49 -

plaintiff's rights "was so 'obvious' that an official must have had knowledge." See id. The Fourth Circuit cautions that courts "should avoid transforming deliberate indifference back into negligence by finding that the reasonably prudent person would have surely known of the issues. We look to whether it was so obvious [the defendant] must have known, instead of whether it was so obvious they should have known." Id. "[G]ood-faith efforts to remedy the plaintiff's problems will prevent finding deliberate indifference, absent extraordinary circumstances." Id.

Plaintiff argues Defendants acted with deliberate indifference because she provided Defendants' employee with information about her rights and her attorneys sent demand letters to Defendants articulating her position that the policy was discriminatory. (See Pl.'s Resp. (Doc. 63) at 26–27.) Plaintiff contends that since Defendants were aware of her grievances and did not immediately modify their policies, they were deliberately indifferent. (See id. at 28–29.)

This court interprets the communications between Plaintiff and Defendants differently. They establish that Defendants knew Plaintiff perceived the exclusion of her service animal to be discriminatory, but Plaintiff points to no evidence that

Defendants agreed that their policies violated Plaintiff's rights. Instead, Defendants wrote that:

> Disabled donors with service animals are provided a full and equal opportunity to donate. Grifols accommodates disabled donors by allowing their service animals to accompany them during the screening, testing, and eligibility phases of the process. However, service animals are not permitted on the secure and aseptic donor floor or any other area where the plasma is being collected or processed.

(Doc. 64-8 at 3.) Based on this statement, Defendants recognized that individuals with service animals have some right to accommodation, but believed keeping service animals away from the actual donation process did not violate the law.[10] (See id.) While legally erroneous, Defendants' belief was not so outlandish as to amount to deliberate indifference.

Under the ADA and Rehabilitation Act, "refus[ing] to permit disabled individuals to be accompanied by service animals" is discrimination. Berardelli v. Allied Servs. Inst. of Rehab. Med., 900 F.3d 104, 114 (3d Cir. 2018); see also 28 C.F.R. § 36.302(c)(1) ("Generally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability."). "A covered actor therefore violates both statutes per se if it denies a

---

[10] This court would be hesitant to hold that merely because a plaintiff sends a demand letter stating a policy is illegal, that the defendant agrees with that conclusion and automatically has knowledge that the policy is in fact illegal.

disabled person's request to be accompanied by his or her service animal unless" an exception applies. <u>C.G. by & through P.G. v. Saucon Valley Sch. Dist.</u>, 571 F. Supp. 3d 430, 440 (E.D. Pa. 2021). One exception is when the service animal "poses a direct threat to the health or safety of others." (<u>See</u> Mem. Op. and Order (Doc. 36) at 12-13 (citations omitted).) "Consistent with CDC guidance, it is generally appropriate to exclude a service animal from limited-access areas that employ general infection-control measures, such as operating rooms and burn units." 28 C.F.R. Pt. 36, App. A.

While this court ultimately concluded that the presence of Plaintiff's service animal on the donor floor did not pose a threat to health or safety, (<u>see</u> Mem. Op. and Order (Doc. 36) at 12-23), Defendants raised several non-frivolous arguments for barring service animals from the donor floor. (<u>See</u> Doc. 22 at 8-16.) Although this court rejected those arguments, (<u>see</u> Mem. Op. and Order (Doc. 36)), there is nothing in the record to suggest they were made in bad faith; Defendants presumably believed one of their arguments would prevail. Notably, there is no dispute that Defendants plasma is manufactured in Spain and its PDCs are inspected and audited by a Spanish regulatory agency. (Knowles Decl. (Doc. 43-1) ¶ 19.) Plaintiff has not presented evidence to suggest Defendants' concern over the

position a Spanish regulatory agency might take was unreasonable or a pretext suggesting deliberate indifference.

Under the circumstances, Defendants' caution in prohibiting a service animal on the floor appears to be a reasonable concern. Although Defendants did not present evidence to justify that concern, the reasonable nature of that concern vitiates any inference or finding of deliberate indifference. The law permits exceptions to the general right of access with a service animal, and Defendants assumed plasma donation was like other medical procedures that are exempted from the general rule.

To find that Defendants acted with deliberate indifference would require this court to ignore the Fourth Circuit's admonition that courts "should avoid transforming deliberate indifference back into negligence by finding that the reasonably prudent person would have surely known of the issues." Koon, 50 F.4th at 407.[11] However, Defendants' mistake about the law in

---

[11] As this court commented at the hearing, (see Hr'g Tr. (Doc. 68) at 10-11, 15-17), Defendants' actions in trashing Plaintiff's donations pursuant to the revised policy come very close to an act of discrimination that could arguably support a finding of deliberate indifference or intentional discrimination. This appears to be the only fact undermining an otherwise relatively reasonable, albeit ultimately rejected, defense to this claim. After consideration of the full record, however, this court finds that action does not support a finding of deliberate indifference or intentional discrimination. It appears to this court that the action was the result of reasonable, but ultimately unfounded, concern with respect to foreign regulations.

this instance does not appear to have been so reckless as to amount to deliberate indifference.[12]

Therefore, Defendants did not act with deliberate indifference and Defendants' Partial Motion for Summary Judgment will be granted as to this issue.

**b.** **Plaintiff's Motion for Summary Judgment**

Plaintiff also seeks summary judgment on the issue of deliberate indifference for the same reasons she opposed entry of summary judgment in Defendants' favor. (See Pl.'s MSJ Br. (Doc. 53) at 28–29.) As this court has explained, Plaintiff's statements to Defendants that she understood their policy to violate her rights are insufficient to show they acted with deliberate indifference. (See supra Section IV.B.3.a.)

---

[12] Defendants also argue that Plaintiff cannot make out the third element of a prima facie case under the Rehabilitation Act as "Plaintiff was never excluded from donating plasma . . . [because of] the service animal policy." (Defs.' Reply (Doc. 65) at 15–16 (emphasis omitted).) However, as Plaintiff notes, total exclusion is not the appropriate standard. (See Surreply (Doc. 66-1) at 3.) The Fourth Circuit has soundly rejected arguments that total exclusion is required to show a violation of the ADA and Rehabilitation Act. See Koon, 50 F.4th at 406 ("If a prisoner without the use of his legs left his wheelchair at the bottom of the stairwell and crawled up to the library, no one would doubt it was a denial of meaningful access."). Plaintiff need not show she was unable to donate to state a claim. Instead, as this court previously found, a covered actor violates the ADA and the Rehabilitation Act "'if it denies a disabled person's request to be accompanied by his or her service animal unless' an exception applies." (Mem. Op. and Order (Doc. 36) at 12 (citing C.G. by & through P.G. v. Saucon Valley Sch. Dist., 571 F. Supp. 3d at 440).)

## V.    **CONCLUSION**

For the reasons stated herein, this court will grant Plaintiff's Motion for Leave to File a Surreply, (Doc. 66), and grant Defendants' Partial Motion for Summary Judgment, (Doc. 58). Defendants' motion shall be granted as to Plaintiff's effective communication claim because Defendants' qualified readers provide effective communication. The motion shall be granted as to Plaintiff's deliberate indifference claim because Defendants did not act with deliberate indifference.

This court will grant Plaintiff's Motion for Summary in part. Plaintiff's Motion shall be granted insofar as she is entitled to declaratory and injunctive relief. Plaintiff is entitled to declaratory judgment that Defendants violate Title III of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act by denying Plaintiff the right to be accompanied by her service animal at all times while donating plasma. Plaintiff is further entitled to a permanent injunction ordering that Defendants shall permit Plaintiff to donate plasma while being assisted by her service animal. Plaintiff's motion is denied insofar as she seeks summary judgment on her effective communication and deliberate indifference claims.

- 55 -

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Leave to File a Surreply, (Doc. 66), is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Partial Motion for Summary Judgment, (Doc. 52), is **GRANTED IN PART AND DENIED IN PART.** Plaintiff's motion is **GRANTED** as to Plaintiff's claims for injunctive and declaratory relief. Plaintiff's motion is otherwise **DENIED.**

**IT IS FURTHER ORDERED** that Defendants shall permit Plaintiff to donate plasma while being assisted by her service animal.

**IT IS FURTHER ORDERED** that Defendants violate Title III of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act by denying Plaintiff the right to be accompanied by her service animal while donating plasma.

**IT IS FURTHER ORDERED** that Defendants' Partial Motion for Summary Judgment, (Doc. 58), is **GRANTED.**

A Judgment dismissing this action will be filed contemporaneously herewith.

This the 31st day of July, 2023.

_William L. Osteen, Jr._
United States District Judge

- 56 -